Norris *v.* Harris.

## NORRIS *v.* HARRIS *et al.*

A WILL made in Texas, operating upon property there situated, must be interpreted by the law of that State.    To that law, reference must be had to determine the capacity of the testator, the extent of his power of disposition, and the conditions upon which the power of alienation vested in the guardian of his children, appointed by the will, is to be exercised.

In the absence of proof to the contrary, the common law is presumed to exist in those States of the Union which were originally colonies of England, or were carved out of such colonies.

The same presumption prevails as to the existence of the common law in those States which have been established in territory acquired since the revolution, where such territory was not, at the time of its acquisition, occupied by an organized and civilized community; but where the population, upon the establishment of government, was formed by emigration from the original States.

No such presumption can prevail as to the States of Florida, Louisiana and Texas. In those States, at the time of their accession to the country, organized governments existed, the laws of which remained in force until they were abrogated by proper authority, and new laws were promulgated.

In the absence of proof as to the laws of Texas, the Courts of this State, in interpreting a will made in that State, will presume its laws to be in accordance with the laws of California.

Norris *v.* Harris.

D, a resident of Texas, and possessed of property situated in that State, makes a will, giving all his estate, real and personal, to his wife and children, in equal interest, one with the other, and investing his wife with the sole and entire control of the whole estate during her life, for the benefit of herself and children, free from the control and guidance of the Courts of law in that or any other State, where she may happen to reside at the time of his death, with full and complete power in her own name, and as guardian of his children, to sell and convey, or exchange, any portion or all of his estate, and to give title to the same, and to purchase with the proceeds such other property as she might deem best for her own interest, and that of his children, " without the intervention or interposition of any Court whatever," and appointing her Executrix of his will and guardian of his children ; *Held,* that, under the will, the wife has power to sell the entire property of the estate ; and that, describing herself in a bill of sale, as " Executrix ;" etc., does not limit the estate sold to her interest as such Executrix ; the designation being intended merely to identify herself as the individual mentioned in the will. The designation does not operate as a limitation upon her power.

The statute of this State, relative to guardians, and the disposition of the estate left to wards, only applies when there is no direction by will as to such disposition.

Where a will appoints a guardian, there is no necessity for the issuance of any letters of guardianship to authorize the guardian to act. The guardian's authority comes directly from the will.

In this State there is no limitation upon the power of disposition by will.

An entire contract is indivisible—the whole must stand or fall together. But a contract, made at the same time, for different articles, at different prices, is not an entire contract, unless the taking of the whole is essential from the character of the property, or is made so by the agreement of the parties, or unless it is of such a nature that a failure to obtain a part of the articles, would materially affect the objects of the contract, and thus have influenced the sale, had such a failure been anticipated.

A sale of nine slaves for a gross sum is an entire contract. There being no means afforded for determining the price of each one, the agreement is implied that the whole are to be taken, or none.

Where, in a bill of sale of all the cattle of a certain estate, estimated at seven thousand head, a total price being fixed, it was stipulated that the vendee, on arriving in Texas where the cattle were, might choose to take all the cattle of the estate without counting them, in which event he was to notify the agents of the vendors of his choice, and pay an additional $4,000 ; but if a count was had, and the cattle exceeded or fell short of the estimated number, the excess or deficiency should be paid for at the rate of eight dollars per head ; and no count was ever made, and no notification ever given by the vendee, that he took the cattle without a count ; *Held,* that the vendor, on the facts, cannot recover the $4,000 ; that the only obligation of the vendee, in the first instance, is to receive the cattle and pay for any excess over the estimated number, if counted ; that his liability for the $4,000 depended entirely on his choice to take the cattle without a count, and that this choice was a mere privilege, to be exercised or not, at his option.

The vendor, after waiting a reasonable time for the vendee to make his choice, he neglecting or refusing to make it, could fix his liability, by making the count himself.

The doctrine of election has no application here. That doctrine applies only to cases where the party, upon whom rests the performance, stands in the same position to both alternatives presented, and is bound to indicate his choice between them. Here, the vendee was bound to choose only in the event he desired to take the cattle without a count. If he did not so desire, he was not required to give notice to that effect. His obligation to pay for any excess was absolute, without any expression of choice; but his obligation to pay the $4,000 was conditional, dependent solely upon the indication of his desire to dispense with the count.

Where the doctrine of election is applicable, the right of election, upon failure of the party upon whom the performance rests, to indicate his choice, passes to the other side, as in this way only can the obligation become absolute and determinate.

APPEAL from the Sixth District.

The case will be understood from the facts stated in the opinion of the Court.

The complaint charged defendant, L. B. Harris, with fraud, in misrepresenting to plaintiff the character and value of the stock in Texas, and also the authority of Amanda C. Harris, as executrix of the last will and testament of Dell, and as guardian of his children, to sell or exchange the property of the estate. It also alleged, that the agents of defendants failed and refused to deliver the stock on demand. The averments amount to this, that the contract between plaintiff and defendants was void, for fraud as above; for inability on the part of defendants to comply with the contract, by delivering to plaintiff all the negroes, horses, cattle, &c.—some of the negroes having been sold, and the number of the stock being greatly less than called for in the contract; and for want of power in Amanda C. Harris to sell the property, and give plaintiff good title to the same under the will of Dell.

Defendants in their answer deny fraud, and aver that their agents in Texas were ready and willing to deliver the property as per contract, but that plaintiff never demanded such delivery; that they offered to pay plaintiff the value of the negroes sold, as also for any deficiency in the number of horses and cattle; and that the defendant, Amanda C. Harris, had full power to sell or exchange as per contract; and that all due and necessary proceedings were taken, according to the Constitution and laws of Texas, etc., to authorize and empower the said

Amanda C. Harris to act as executrix of said will, and guardian of said children, either in the said State of Texas or elsewhere, and to make due and valid sales.   Defendants prayed, in their answer, that the bill be dismissed, and that they have judgment for $4000, in pursuance of the contract.

The will of Dell is as follows:

"In the name of God, amen.  I, Charles L. Dell, of the town of Houston, in the county of Harris and State of Texas, of the age of thirty-three years, and being of sound memory and discretion, do make, publish and declare this my last will and testament, in manner following, that is to say: First, after the payment of all my just and lawful debts, I give and bequeath and devise unto my wife Amanda C. Dell, and to my children now living and those born subsequent to the execution of this my last will and testament, that may be begotten by me upon the body of the said Amanda, all my estate, real and personal, of every kind and description, in equal interest, one with the other.

" Second.  I give and bequeath unto my said wife, Amanda, the sole and entire control of all my said estate, real and personal, during her life, for the benefit of herself and my children begotten by her, free from the control or guidance of any Court of Probate, or any other Court or Courts of this or any other State where she may happen to reside at the time of my death; it being my wish and will that all my property shall remain undivided until her death, unless she, by her own wish and accord wishes to divide it sooner.   In which case, I hereby give her the power so to do, in accordance with the provisions of this, my last will.

"Third.   I give and bequeath to my said wife, Amanda, full and complete powers, in her own name, and as guardian of my children, to sell and convey or exchange any portion, or all of my said estate, and to give title to the same, and to purchase, with the proceeds, such other property as she deems best for her own, and the interests of our said children begotten between us, without the intervention or interposition of any Court whatever—save and except my stock of cattle, which are not to be sold until after the elapse of two years after my death, unless they can be sold for eight dollars ($8.00) per head, in which event, I give her full power to sell them; also with the exception of a certain tract or parcel of land, containing four hundred and fifty-four acres, in the county of Fort Bend, State of Texas, situated on the Brazos river, which I purchased of T. S. Pratt and wife Susan, ——day of A. D.

1853—which it is my will and wish shall not be sold until the lapse of twenty years.

"Fourth. Should all my children begotten, or which may hereafter be begotten between myself and my said wife, Amanda, die unmarried and minors, my wife, Amanda, surviving them, then, and in that case I give and bequeath to my said wife one entire half of all my estate, to be disposed of as she likes; and the other half I give and bequeath to William T. Rawks, of the county of Marion, in the State of Florida, and the heirs of Samuel W. Allen—that is so to say, the property so bequeathed, to be divided into two equal parts, one of which shall go to the said Rawks, and the other to the heirs of the said Samuel W. Allen, who is now a resident of Harris county, State of Texas.

"Lastly. I do hereby appoint my aforesaid wife, Amanda C. Dell, Cornelius Ennis, of the county of Harris, State of Texas, and Samuel R. Piles, of the county of Alachua, State of Florida, executors of this, my last will and testament, and guardians of my above named children, now living or which may hereafter be born; and having full confidence in their integrity and honor, I do not wish bond or security to be required of either, or any of them, for the faithful carrying out of the provisions of this my last will. My said wife Amanda alone to act as executrix of my estate, and as guardian of my children as aforesaid, during her life, with or without the consent or approbation of the above other two executors and guardians, and not to be controlled by the dissent or disapprobation of either or both; but in the event of the death of my said wife Amanda, before all or any of my children are married, or arrive at the age of twenty-one years, then, in that case, I wish the above named Piles or Ennis, both or either, to act as executor or executors, and as guardian or guardians, of all, or either, or any of my said children, who are not married and have not arrived at the age of twenty-one years, at the death of my said wife, with powers as full and ample and upon the same terms and conditions as I have granted to my said wife Amanda; and in no event do I wish the paternal grand-father, Bennett M. Dell, of the county of Alachua, State of Florida, nor the maternal grand-father, Alexander Brifan, of the county of Chatham and State of Georgia, of my children, to have any control of the persons or property of any or either of my children now living, or may hereafter be born; and more particularly and positively do I wish that C. F. Dewer, of the county of Harris, State of Texas, should be forever excluded from all or any control, or interference under any possi

ble circumstances over the persons or property of my children herein provided for.

"In testimony of all which, I have hereunto set my hand and seal, at Houston, county of Harris, State of Texas, on this the tenth (10) day of June, in the year of our Lord, one thousand eighteen hundred and fifty-three, (A. D. 1853).

Witnessed by three persons.

(Signed)      CHARLES L. DELL.    (Seal.) "

The contract is as follows:

" Know all men by these presents, that we, Lewis B. Harris and Amanda C. Harris, his wife, executrix of the last will and testament of Charles L. Dell, late of Harris county, State of Texas, deceased, for and in consideration of the sum of six thousand dollars to us in hand paid by Samuel Norris, of the State of California, the receipt whereof is hereby acknowledged, do by these presents, grant, bargain and sell unto the said Samuel Norris, his heirs and assigns, the following property, to wit: A negro woman named Dorcas, about thirty-five years of age, and her two children, one a boy, named Henry, about ten or eleven years of age, the other a boy named Tom, seven or eight years of age; also a negro woman named Ann, about twenty-three years of age, and her child Eugene, about seven or eight years of age; also a negro girl, about sixteen years of age, named Ellen; a negro boy named Pink, about thirteen years of age; a negro boy named John, about fifteen years of age; a negro boy named Henry, about ten years of age. And for the consideration of nine thousand dollars to us in hand paid by said Samuel Norris, the receipt whereof we hereby acknowledge, we grant, bargain and sell unto the said Samuel Norris, two hundred and fifty head of stock, horses, mares and colts, mules and jacks, comprising all the stock, horses, mares, colts, jacks and mules belonging to the estate of said deceased. And for the further sum of fifty-six thousand ($56,000) dollars, to us in hand paid by said Samuel Norris, the receipt whereof is hereby acknowledged, we do further grant, bargain and sell unto the said Samuel Norris, his heirs and assigns, seven thousand head of cattle, consisting of cows and calves, bulls, beeves and bullocks, comprising all the cattle belonging to said estate; also all the cattle brands belonging to, or used by said estate as follows, to wit: also all the cattle pens, or cattle inclosures; all the saddles and bridles, lariats, lassoes, etc., belonging to said estate; to have and to hold all the described property unto him, the said Samuel Norris, his heirs and assigns forever; and we, the said Lewis B. Harris and Amanda C.

Norris v. Harris.

Harris, executrix as aforesaid, do warrant the said described negroes to be sound in mind and body, and to be slaves for life, and we the said Lewis B. Harris and Amanda C. Harris, for ourselves and heirs, executors and administrators, all and singular the said bargained property unto the said Samuel Norris, his heirs or assigns, against ourselves, and against all and every person or persons whomsoever, we will warrant and forever defend by these presents.

" It is understood that the negroes heretofore described, are the negroes belonging to the estate of said deceased. It is further understood, that the said described cattle are running in the counties of Harris, Brazoria, Fort Bend and Galveston, in the State of Texas. It is further understood, and it is hereby agreed in consideration of the premises, that upon the arrival of the said Samuel Norris, or his agent, in the said State of Texas, for the purpose of taking possession of said property, if he shall choose to take all the neat cattle belonging to the estate of said deceased, in the State of Texas, without numbering or counting the same, he shall thereupon by himself, or his agent, notify D. W. C. Harris, or agent in possession of said cattle, of his intention to take all said cattle belonging to said estate without numbering or counting them, and in consideration thereof shall pay to us the further sum of four thousand dollars. But should the said Norris number and count said neat cattle hereinbefore described, and the cattle belonging to said estate exceed the number of seven thousand head, then the said Samuel Norris shall pay to us, or our executors, administrators or assigns, eight dollars per head, large and small, for each head of cattle over and above the number of seven thousand head. But if upon numbering or counting the said cattle belonging to said estate, they shall fall short of the number of seven thousand head, then we agree to repay said Samuel Norris, his heirs or assigns, eight dollars per head, for each head of cattle which shall fall short of seven thousand head.

" It is hereby further agreed, that if the stock of horses, mares, colts, mules and jacks, belonging to said estate, upon being counted, shall exceed the number of two hundred and fifty head, then the said Samuel Norris shall pay to us thirty-six dollars for each and every head over and above two hundred and fifty; and on the other hand, if the said stock of horses, mares, colts, mules and jacks shall fall short of two hundred and fifty head, we agree to refund to said Norris, his heirs or assigns, thirty-six dollars per head for each head of said horses, mares, colts, mules and jacks that shall fall short of two hundred and fifty.

Norris *v.* Harris.

"In witness whereof, we have hereunto set our hands and seals, this nineteenth day of April, A. D. 1856. The words 'hundred' erased, and the words 'fifty-six thousand' inserted in lieu thereof, before signing and delivering. It is understood and agreed that the said Samuel Norris shall have all the increase, natural or otherwise, of all the said described stock, from and after the date of these presents."

LEW. B. HARRIS,    (Seal.)

AMANDA C. HARRIS,    (Seal.)"

Depositions having been taken by both parties, and the cause being called for trial, a decree was entered, in substance, as follows : that this cause came on to be heard on the complaint, answer and depositions on file, and on motion of defendants, no one appearing for plaintiff, judgment was entered for defendants against plaintiff, for the sum of $4,000, less the sum for which three of the negroes had been sold.

Plaintiff, on affidavits of surprise, etc., and for errors in the decree, defendants filing counter affidavits, moved for a new trial, which was granted, defendants excepting, and appealing to the Supreme Court.

A stipulation was signed by the parties that, " on the hearing of this appeal, the Supreme Court may revise any errors in the final decree of December 4th, and the entire record, the same as though upon a direct appeal of the plaintiff therefrom, rendering upon the whole record such final judgment and decree as in law and equity should be made."

*Winans,* for Appellants.

I.   Although technically this appears to be an appeal from an order granting a new trial, the question whether a new trial was properly granted, either on the ground of surprise, or otherwise, is superseded by the subsequent stipulation of the parties, and the case is presented to this Court for final adjudication upon its whole merits as exhibited in the record.

II.   The gravamen of this action is fraud, but plaintiff, having by his own evidence, entirely disproved the existence of fraud in any form, has fallen back upon subordinate propositions.

III.   Plaintiff was not entitled to rescind the contract, on the ground that it was entire for the whole of the personal property; that there was a partial deficiency thereof; and that defendants were thus unable to make a literal performance of their covenants.

16

We do not object to the law of plaintiff, but to its application.   The cases hold that an entire contract is inseparable, and the whole thereof must stand or fall together.   The question then arises, what is an entire contract?   In *Story on Contracts*, 17, it is thus defined:   "An entire contract, in the first place, must be an absolute contract, for the whole or nothing, and any condition annexed to it must affect the whole.   It contemplates no possible divisibility, and whenever it affords means of estimating the value of portions, it precludes the idea of divisibility by affixing an unconditional agreement for the whole."   Now in one sense, if tested by this rule, the contract in question was entire.   It was a sale in addition to certain negroes therein described, of all the horses, and of all the cattle " belonging to the said estate," that is, the estate of Charles L. Dell.   It was therefore defendants' duty to deliver plaintiff, not only said negroes, but all the horses and cattle " belonging to the said estate."   Had they tendered the negroes and horses only without the cattle, or the horses and cattle only without the negroes, or the negroes, horses and cattle, but not *all* the horses and cattle belonging to said estate, there might perhaps have been a failure to perform.   (See *Johnson* v. *Johnson,* 3 Bos. & Pul. 162.)

The plaintiff construes the entirety of the contract to consist, not in the delivery of the negroes, horses and cattle, but in the specific number of each, assumed for the purposes of the bargain to exist; and while he claims that there was a large deficiency in number, invokes the principle that the sale of a certain quantity of chattels, more or less, will not tolerate a great deviation from the assumed number.   If this were so, plaintiff's error consists in the fact that he confounds " entire contracts " with " contracts for the sale of certain quantities of commodities, more or less."   Plaintiff buys and agrees to take, in this contract, such a quantity of the commodities named as constitutes the whole number thereof " belonging to the said estate."   It was not the number sold which constituted the substantial thing and the gist of the contract, for that number had to be assumed, but the real obligation of the contract was that the property to be delivered should comprise all that belong to the said estate.   In *Minor* v. *Bradley* (22 Pick. 459) it is said:   " Where a number of articles are bought at the same time, and a separate price agreed upon for each, although they are all included in one instrument of conveyance, yet the contract, for a sufficient cause, may be rescinded as to part, and the price paid recoverd back, and may be enforced as to the residue."   (See also, *Franklin* v.

Norris *v.* Harris.

*Miller,* 4 Adolph & Ellis, 599 ; *Boone* v. *Eyre,* 1 Henry Black. 273, note *a.*)

1. Conceding that the assumed number of cattle, horses and negroes did not exist and could not be delivered, yet the contract expressly provided for this contingency, and rendered the delivery of whatever number did exist sufficient.

2. Under the contract, no other evidence of a deficiency in number could be created than what resulted from an actual count made by plaintiff.

By the conditions of the contract, plaintiff had the choice either of taking said horses and cattle, whatever their number might be, without numbering or counting them, in which event he was to pay defendants $4,000 ; or if he made such count and its result should determine their number to exceed or underrun the estimate of two hundred and fifty head of horses and seven thousand head of cattle, to be paid a certain sum per head for such deficiency or to pay the same for such excess. The evidence shows that plaintiff omitted to make a count ; he, therefore, of his own free will and choice, embraced the other alternative of the contract, and accepted the liability to pay the arbitrary consideration which had been agreed upon without reference to number.

3. The evidence which does exist respecting the number of the cattle and horses is indeterminate and vague. It fails to prove any deficiency whatever, or to show a non-compliance by defendants, or inability on their part to comply with their contract.

4. Plaintiff, by his own conduct, admitted a compliance with the contract, so far as the question of number was concerned. As he made no objection to taking possession of the property when the delivery thereof was tendered, he waived that objection on the principle *qui tacet consentire videtur.*

5. Defendants offered, at the time stipulated for plaintiff to take possession of the property, to make up any deficiency in number that might be found to exist.

IV.   The bill of sale to plaintiff from defendants, vested in him a perfect title to the property, and to the whole thereof.

1. The will, by its own provisions, gave defendant A. C Harris authority to make the bill of sale, and thereby convey title.

The provision in the bill to which we especially refer, is as follows : " I give and bequeath to my said wife Amanda, full and complete power, in her own name, and as guardian of my children, to sell and convey, or

exchange any portion or all of my said estate, and to give title to the same." The phrase "as guardian of my children" is a mere *descriptio personæ*. The object of its introduction is, to show that as, by the will, defendant is constituted guardian of the children, any conveyance made by her shall, therefore, be a transfer of their right. It is a question of *power*, not of *form*, and the language indicates, not that she must convey as guardian *eo nomine*, but that a conveyance by her, because she is invested with the capacity of guardian, will be effectual to transfer the title of the children. Moreover, the whole scope, and spirit, and tenor of the will shows that it was the design of the testator to give her free, unqualified control over the estate, and an unrestricted right to alienate the same without coercion of the Courts, or any embarrassments of form—vesting the entire authority to control and sell in her discretion, and the means of its performance in the use of her single name.

2. It was competent for the testator Dell to give such authority in his will as it contains, whether his right of disposition be tested by the laws of Texas or of California.

Conceding that the law of California constitutes the criterion of defendants' rights, the testator had a perfect right to make such disposition and to appoint such mode of alienation of his property as the will provides, and the bill of sale conveyed entire and perfect title. In the act respecting the estates of deceased persons, (sec. 178) it is provided that the executor, in making sales of property belonging to the estate, shall proceed in all respects as if the sale were made under the order of the Court, "unless there are special directions given in the will, in which case he shall be governed by such directions." This is made directly applicable to all cases where, as the same section recites, "any property (is) directed by the will to be sold." Such is also, substantially, the law of Texas, and of the other States. It is an affirmance of the common law, that a testator may make such disposition of his property, and make it in such form as he desires, subject only to laws restraining capricious or obnoxious alienation. Where the right to sell exists, it may be exercised in any form which the testator may select; nor is the intervention of the Courts, and especially the cumbersome machinery of the Probate Courts, resorted to, when the will directs the sale of property without their aid.

3. If, under the laws of Texas, defendant A. C. Harris had no authority to convey full title by the bill of sale, plaintiff, who held the affirmative, and on whom rested the *onus probandi*, should have shown

that fact.   In the absence of such proof, it becomes a legal presumption that defendant had authority, and plaintiff is estopped from assuming that her authority is determinable by the laws of this State, or that she had not authority by the laws of Texas.   (*Thompson* v *Ketchum,* 8 Johns. 191; *Robinson* v. *Bland,* 2 Burr, 1077; *Male* v. *Roberts,* 3 Esp. N. P. 163; *Collett* v. *Keith,* 2 East. 260; *Thompson* v. *Ketchum,* 4 Johns. 287; *Greenwade* v. *Greenwade,* 3 Dana Ky. 496; *Hosford* v. *Nichols,* 1 Paige, 225; *Fanning* v. *Consequa,* 17 Johns. 511.)

4. If defendant A. C. Harris omitted any proceeding in the Probate Courts of Texas which the law required, it was for plaintiff to show such omission, not for defendants to prove compliance.

V.   Even if the bill of sale did vest in plaintiff, not a perfect but a partial title to the property, he was not, under the circumstances of this case, entitled to rescind the contract.

1. The bill of sale created a change of property, and constituted a delivery thereof.   Plaintiff is in constructive possession, and has not been ousted therefrom, nor deprived of title by another.

2. The tender of delivery vested the property in plaintiff, and defendants' contract was performed thereby.

A contract to deliver specific articles of property to another, at a certain time and place, is performed by a tender and delivery of the property at the time and place, although the contractee did not attend to receive the property.   (*Case* v. *Green,* 5 Watts, 262; *Robbins* v. *Luce,* 4 Mass. 474; *Robinson* v. *Bachelder,* 4 N. H. 40.)   Such a tender vests the property in the vendee.   (*Barney* v. *Bliss,* 1 D. Chip. 399; *Gilman* v. *Moore,* 14 Vt. 457; *Bryant* v. *Gala,* [cited in *Bliss* v. *Granger*] 3 Vt. 343; *Borden* v. *Borden,* 5 Mass. 67; *Goodwin* v. *Holbrook,* 4 Wend. 377; *Whitney* v. *Herrick,* 4 Cow. 439.)

VI.   The defendants were entitled, under the contract, to recover a judgment for the sum of $4,000, less the value of the negroes, which was $1,800, and the Court below properly rendered such judgment.

1. Defendants, in their answer, pursuant to the statute, properly ask for such affirmative relief.

2. The right of election which existed in plaintiff was by his *laches* transferred to defendants.

The contract expressly gives to plaintiff an election to either take the property without numbering or counting, upon his giving defendants' agent written notice to that effect, in which event he was to pay $4,000; or to make a count, in which event, if the number overran

the estimated quantity, he was to pay for the excess, and if it underran, be paid for the deficiency.    A given time, namely, his arrival in Texas, was prescribed for the adoption of either of these alternative modes. Defendants contend that an election being thus given him, and a time fixed for its exercise, if no election was made by him, he lost his right of election, and defendants might thereupon elect which mode of performance they would demand.    (*Layton* v. *Pearce*, Doug. 16; *Barker* v. *Jones*, 8 N. H. 413; *Chittendale* v. *Thurston*, 4 Carr & P. 98; *Mallam* v. *Arden*, 10 Bingham, 299; *McNitt* v. *Clarke*, 7 Johns. 464; *Patchin* v. *Swift*, 21 Vt. 292; *Church* v. *Fetterow*, 2 Penn. 301; *Choice* v. *Mosely*, 1 Bailey, 136.)

VII.    If on the whole case the defendants are not entitled to final judgment in their favor, then the only relief claimed by plaintiff, and consequently the only relief he can obtain, consists in an affirmance in this Court of the order granting a new trial.

*Robinson & Beatty*, also for Appellants.

I.    The defendants were entitled to recover the $4,000 as a counter claim, because the bill of sale contained no warranty as to the number of cattle.    The number was to be settled by plaintiff himself, after reaching Texas, and making inquiry.    He was then, by the terms of the contract, to select one of the two modes of determining defendants' rights and liabilities, and of his own, to wit: to take the cattle in a lump, and pay $4,000 extra, or to count them, and pay so much for any excess over the estimated number of 7,000.    And, as he failed to make his election within a reasonable time, the right belongs to appellants, and they exercised it, in their answer.

Great stress is laid in the argument on the fact that Norris was to give notice of his taking the cattle without a count, and it is argued that, inasmuch as he gave no notice, he did not make the choice.    But the difficulty is just as great, upon his own statement that he made no count.    If he took them without enumeration, he was to give notice; if he determined otherwise, he was to count them.    He has done neither, and seeks now to escape the responsibility of his obligation through the merits of his own wrong.    It is because he has failed to act, whether to give the notice or make the count, that this right has accrued to appellants.    If he had acted, we would have been concluded by his acts; as he has not acted, we can take such course in the premises as is most convenient to us.    We could not count them under the agreement.

Norris *v.* Harris.

II.   Plaintiff insists "that this was an entire contract for the whole of the presumed property belonging to the estate, and not a separate contract for each item."

That it was not a separate contract for each cow, for each horse, and each negro, we admit.   But we do not admit that the want of some of each of the articles sold, would justify a rescission of the contract.   We contend, that if all the negroes and all the horses had been wanting, the contract would not have been thereby void, if compensation had been tendered therefor—simply because the value of these articles bore no such proportion to the whole value of the purchase as would justify its cancellation.

But this point is immaterial; for whatever may be the force of Norris' objection, on the ground that some of the negroes were disposed of, as a matter of law, the question is settled by the testimony. This shows that there was an understanding between the parties, that some of the property sold might be disposed of by the agent of defendants, and provision was expressly made for such contingency.

As to the cattle, there was no deficiency.   But suppose the number of cattle was less than 7,000, by 2,000 or 4,000, the plaintiff even then has mistaken his remedy.   This does not justify a cancellation of the contract; for we hold that there can be no rescission of a contract of bargain and sale for a deficiency in the number of articles sold, when provision is made in the contract for such deficiency, and for its compensation.

III.   Plaintiff claims that he had a right to rescind the contract, on the ground that the bill of sale did not vest in him a good title to the whole property.   The complaint charges, that "there was no judgment, order or decree, or proceeding had or taken by said Court, or by any other court in Texas, authorizing or empowering him, according to the laws of that State," etc., without stating, that by the laws of that State such order, judgment, etc. were necessary.   Plaintiff should have shown what the law of Texas was.

Plaintiff argues that the Court will presume, that all acts necessary to done by Mrs. Harris, under the will, by the laws of California, were equally necessary by the laws of Texas.   When contracts have been entered into, or are to be executed in a foreign country, or in a neighboring State, and the Court has no official information of what the law of such State or country is, and no proof is given of it, the Court will usually decide according to its own law.   In such cases, the Court

presumes the common law of other countries is the same as its own. But this presumption is confined to the interpretation of contracts, and the ascertainment of the meaning of parties, and is never extended to the imputing a wrong or the creation of a crime. The presumption that the law of Texas is the same as that of California, is not so violent, that an act will be deemed criminal if committed there, because, by statute, it is made criminal here. The rule is, that courts recognize the common law of other countries to be the same as their own, but they do not extend their statutes by such presumption. This is the sum of all the authorities. (10 Wend. 75, 78 ; 3 Dana, 495 ; 8 Johns, 189 ; 2 Blackford, 84 ; 7 Yerger, 397 ; 1 Selden, 447.)

The argument of plaintiff is, that Harris sold him some property which he had no right to sell. This, if true, is a fraud on the part of Harris. The law does not presume a fraud. On the contrary, it presumes that whatever a man does, he has rightly done, and had authority to do ; if the contrary view imputes an offense, of this fraud there is not a particle of proof. But by presuming the law of Texas to be the same as that of California, it is established that he had no right to sell that which he has sold, and, therefore, he is guilty of fraud.

The second branch under this head is, that the bill of sale vested no title to the property in Norris, because it was signed by Mrs. Harris, as executrix, instead of guardian. Admitting there was a mistake in this respect, it is only the ordinary case of the defective execution of a power, for which equity will furnish ample relief. For it is admitted, that Mrs. Harris had the power, under the will, to sell as guardian. But she was executrix, as well as guardian ; and, as executrix, under the common law, she had authority to sell the personal property of the estate. (Toler's Law of Executors, 256 ; Bouvier, Title Executor, 2 Kent's Commentaries.)

If she had power, under the will, to sell as guardian, she had likewise power, under the will, by the common law, to sell as executrix. If, as is alleged, she could not sell, as guardian, for the want of some "judgment, decree," etc., the defect is cured by the mode and manner of the sale which was adopted, and the very objection which plaintiff raises to the execution of the power, serves to secure him an ample and complete title.

Mrs. Harris, in her own right, and under the will, stood, in relation to this property, in a four-fold capacity. First, if the law of California is the same as that of Texas, by presumption, she was owner of

one-half of the estate, by virtue of her interest in the community of acquests and gains. As legatee, she is entitled to one-third of the remainder, in which two capacities she was entitled to two-thirds of the entire property—with unqualified powers of disposition of the one-half, and of the remaining sixth, on the conditions of the will—that is, in two years after the testator's decease, or when the cattle could be sold for eight dollars per head. She was also executrix of the will, and guardian of the persons and property of the children. In one or the other, or in all these capacities, she had the power to execute this sale, and she has executed it. It is objected, however, that she has not executed it in the right capacity. This objection would lie as well to the disposition of her own portion, because she signed the bill of sale as executrix, and not in *propria persona.* The bill of sale purports to sell, not all her interest, as guardian or executrix, or in her own right, but all the cattle, etc., belonging to the estate of Dell. If, in any capacity, she had the power to sell the whole estate, when she sold, she was in the exercise of that capacity. The question is not, what description was given of her authority, but it is, did she have the authority at all ? If she did, the sale is good, though the description is bad. The case is not that of an agent, doing an act for another. Mrs. Harris' power resides in herself—under the will, it is true, but, nevertheless, it was in her alone ; and that power could only be exercised by her, in her own name. The title, executrix or guardian, given in the act of sale, does not describe or limit her power. The title is only a *descriptio* (or, rather, a *designatio*) *personæ.*

The whole will shows the intention of the testator to give his widow entire control and power over his estate, with the single limitation as to the cattle. In short, she acquired property in the estate. The will directs, that Mrs. Harris shall sell the stock, when the price can be obtained. In obeying its provisions, she executed the will, and hence is its executrix. In obeying this portion of the will, or any other portion, she is an executrix, and only in such capacity, could she carry out its provisions. A guardian, as such, has no power, in obedience to the provisions of a will, to perform any of its directions ; when he so undertakes to do, he becomes executor. That the two characters are united in the same person, can make no difference. It is not, under what title Mrs. Harris has acted, that is important ; but did she have the power to act at all, is the inquiry. Her various titles and relations to this property cannot invalidate one or the other. The title she gives her-

self in the bill of sale, does not destroy her power, if she give it under a mistake. Nor does the title make the transaction less binding on her, and, of course, on Mr. Norris.

*Heydenfeldt*, also for Appellants.

Two objections are made to the title conveyed by the bill of sale.

1st. That Mrs. Harris had no power to sell as guardian of her children, because she had no letters of guardianship.

2d. That the testator could not give to a guardian authority to sell without the order of the Probate Court.

The first question to be determined is, by what law are we to be governed in giving an interpretation to the will of Dell. This question is solved by all of the best authorities.

Greenleaf says: " The interpretation of wills, whether of movable or immovable property, where the object is merely to ascertain the meaning and intent of the testator, if the will is made at the place of his domicil, the general rule of the common law is, that it is to be interpreted by the law of that place." (2 Greenl. Ev. sec. 671.)

Jarman says: " The law of the place where such property is locally situated is to govern,. as to the capacity or incapacity of the testator—the extent of his power to dispose of his property," etc. (1 Jarman on Wills, 1.)

Texas was the domicil of Dell, and there the will was executed. The law of Texas must therefore govern, but in the absence of proof as to what the law of Texas is upon this subject, the rule is to presume the existence of the common law, and to be governed by its rules.

No statute of one State, which alters or modifies the common law, is presumed to have been adopted in any other State. (*Forbes* v. *Scannell*, 13 Cal. 242.)

There was no necessity for letters of guardianship to constitute Mrs. Harris the guardian of her children, for by the common law, upon the death of the father, she became at once the guardian by nature, in the absence of a disposition of a control of the children by the will or deed of the father; and in the second place, the father has the right by will to appoint a guardian for his children, and has appointed the mother. (2 Kent, 206, 220, 224.)

Nor does the statute of California alter the common law rule. (Act relative to Guardians, sec. 10, Wood's Dig. 427.)

Now, as letters of guardianship are only the evidence of the appoint-

Norris v. Harris.

ment by the Probate Judge, of course, if he cannot appoint, there is no necessity for the "letters."

The second objection, to wit: That the testator could not confer the power to sell the infants' property without an order of the Probate Court, concedes that the will does attempt to confer the power, and that there is no question to be raised as to the intention of the testator; indeed, not only the words of power, which are cited by the respondent's counsel, but the entire context, and all the language used, shows the spirit and intention beyond a doubt. In relation to the cattle, the power to sell is totally unconnected with any description of the wife, either as guardian or executrix.

To show, then, that the objection taken is unsound, it is sufficient to note, that, at common law, the Probate Court had nothing to do with the relation of guardian and ward; that jurisdiction belonged exclusively to the Court of Chancery, and is only conferred on the Probate Court by the local law of this State, which will not be presumed to be the rule in Texas.

But independent of this answer to the objection, there is no limitation existing by the common law, or the statute law of this State, upon the power of disposition by will.

It extends, says Jarman, to all interests in real or personal estate. (Jarman on Wills, 81.)

Sugden says: "A power given by a will to sell an estate is a common law authority." (1 Sugden on Powers, 1.)

The power given to Mrs. Harris by the will of Dell is of a kind which is of ordinary and frequent occurrence, and it falls under the rules laid down by law writers in regard to conversion or constructive conversion.

It occurs wherever the legatee's enjoyment is postponed, or apparently postponed, until conversion.

In the case of the *Attorney General* v. *Mongles*, the powers given by the will to the executors were precisely similar to those in the will of Dell, but there was no pretense that the testator had exceeded his powers. In that case the executors had no personal interest, the whole estate was bequeathed to the children of the testator, but the power to sell, convert, repurchase or invest was considered absolute by the dictum of the Court.

The Court is respectfully asked to examine this case reported in 5 Mees. & Wels. 120; (see also, 1 Jarman on Wills, 483; *Brown* v. *Bigg*, 7 Vesey, 279, and cases).

So that, although Dell's children took their interest in the property subject to the trustees' power to convert, they possessed the right of enjoyment as well before as after the conversion.    (2 Jarman on Wills, 484; *Pearson* v. *Lane*, 17 Vesey, 101.)

No rule can consequently be invoked in their favor, or on their account, which would induce a Court of Equity to construe the power given to Mrs. Harris, so as to limit its extent or cripple its efficiency against the literal force of the language of the will and the manifest intention of the testator.

*Crockett & Crittenden,* for Respondent.

I.  The judgment below allowing defendants' counter claim of $4,000, less the amount received on the sale of the negroes, is erroneous.

There is no evidence to show that Norris ever " chose " to take the cattle without counting them, nor that he ever gave notice of any such intention to the defendants, or their agent, or to anybody else; and, as it was only upon the consideration that Norris should so " choose," and should give notice of his intention, that he was to become liable to pay the $4,000, no such liability has ever been incurred.

If a contract is in the alternative for the performance of one or the other of two different acts, the liability is discharged by the performance of one of those acts.    The right of election is in the party who is to do the first act.    If he fail to exercise it in proper time, it passes to the other party.    (1 Bouvier's Law Dic. 460 ; Addison on Contracts, 1125 ; 2 Parsons on Contracts, 169–170 ; 3 Bacon's Abr. 307 ; *Chippendale Ex'rs* v. *Thurston*, 4 Carr. and Payne, 98.)

It will perhaps be said for respondents, that under this contract Norris had an election to take the cattle, with or without a count; that he was bound to make his election when he went to Texas to take possession; that he failed to do so; that the right to make it thereupon passed to Harris and wife; and they elected that Norris should take the cattle without counting them, and pay the $4,000.

The contract gives no election in the proper and legal sense of the term.    Norris was not bound to do one of two things.    He was bound to do but one, and that was to take the cattle at their estimated number, and to pay for the excess, if, upon counting, there should prove to be any excess.    The right was given him to avoid this liability and substitute another by his own act, but that was a condition for his advantage exclusively, and which could only become effective by his choice and declaration.

It was a mere privilege conferred on him, and only to be enjoyed by him, upon notice, and for which he was to pay $4,000.

In every case of election, the person entitled to it is bound to give notice which of the alternatives he selects, or to show which he selects by some act done in due season. In reference to both alternatives, he occupies the same position, and is as much bound to indicate his choice of one as of the other. If not so bound, it is not an election. Yet in this case Norris was under no obligation to give notice of any choice, except in the single event of his desiring to take the cattle without count.

To pay for the excess, if there should be any, was an absolute obligation; to pay the $4,000 was a conditional one, dependent solely upon his choice and act. The event did not take place, and the latter obligation never became absolute.

II. Defendants not having all the property which they agreed to sell and deliver to Norris, the latter was under no obligation to accept the part, but was at liberty to rescind the contract.

This was an entire contract for the whole of the personal property, and not a separate contract for each item. It was entire for all the items, and for the full amount of each. (Story on Cont. secs. 22–24, and cases cited; 2 Kent's Com. 470; *Atkinson* v. *Smith,* 14 Mees. & W. 695; *Sleddon* v. *Cruikshank,* 16 Id. 71; *Scott.* v. *The Eastern Counties R. Co.* 12 Id.. 33; *Franklyn* v. *Lamend,* 4 Mann. Gra. and Scott, 647; *Paige* v. *Ott,* 5 Denio, 406; *Miner* v. *Bradley,* 22 Pick. 459; *Barclay* v. *Tracy,* 5 Watts & Serg. 45; *Mills* v. *Hunt,* 17 Wend. R. 333; Same case, 20 Id. 431.)

It is admitted that the defendants' agent had sold some of the negroes, and the defendants no longer had them to deliver when Norris arrived in Texas.

It may be said, in respect to the deficiency in the number of horses and cattle, that there was no positive stipulation that they should amount to the number designated, and that the case of a deficiency was expressly provided for, and that the terms upon which it was to be made good were agreed upon. But the contract contemplated only a reasonable excess or deficiency—such as might be covered by the words more or less; and these words will only cover a moderate excess or deficiency. (Addison on Cont. 173 and cases cited; *Cross* v. *Eglin,* 2 B. and Ald. 106. See also Story on Sales, sec. 424; Id. on Contracts, sec. 481.)

III.   Plaintiff had a right to rescind the contract,· because defendants' bill of sale did not vest in him a good title to the whole property. (2 Kent's Com. 470; Story on Sales, 203, 423 and cases cited.)

The validity of a contract is to be determined by the law of the place where it is made, unless it is to be performed in another country, and then it must be determined by the law of the place of performance.   (2 Kent's Com. 453–462, and cases cited.)   It is unnecessary to inquire whether this contract was in any sense to be performed in the State of Texas, and therefore to be construed by that law ; for it is well settled that " foreign laws are regarded as facts, and should be alleged and proved like other facts of which the Courts do not take judicial· notice ;" and that " in the absence of such allegations and proofs, our Courts will presume that the foreign laws are in accordance with our own." (*Monroe* v. *Douglass,* 1 Seld. 447.)   In this case there is no allegation nor· proof of what the law of Texas is, nor that it is in any respect different from our own ; and in the interpretation of this contract we are, therefore, referred to no other law than the law of California.

By the will, under the law of California, Mrs. Harris took an equal undivided interest in the property with her children ; that is, she took a child's part, and no more.   Any instrument by which she might convey all her interest in the estate, would convey nothing but that part. Such would be the legal effect of any conveyance by her of the whole estate.

It is true, the will gives to her the sole and entire control during her life, of all the testator's estate, real and personal, for the benefit of herself and her children, free from the control of any Court.   But by *control* is meant only *management.*   It is clear that this clause gave no power of disposition.   To control and to alienate, are words of wholly dissimilar signification.

That no power of sale or alienation was intended to be given by this clause, is *further manifest* from the subsequent provision, in which such a power is given, and certain limitations imposed upon its exercise.   What power of alienation she was to have, is declared in the third article of the will, which gives her " full and complete powers in her own name and as guardian of her children, to sell and convey, or exchange, any portion or all of the estate, and to give title to the same, etc., without the intervention or interposition of any Court whatever."

This power was to be exercised in a two-fold capacity.   Under it and

in her own name and right she could convey but her own interest under the will. It was only as guardian that she could, by any alienation, affect the interests of her children; as executrix, she has no power whatever to sell the estate, or any part of it, for any purpose.

Her rights, then, in regard to the property were these: She was the absolute owner of an equal undivided interest with her children; she was nominated their guardian, and, as such, the will directed that she might sell or exchange their share of the property, whenever, in her own name, she sold or exchanged her own; and she was named, in effect, sole executrix, without any power, as such, to sell or dispose of any part of the estate.

The complaint avers that Mrs. Harris never obtained letters testamentary, nor of guardianship, either in Texas or California, and never qualified in either State, either as executrix or guardian, and this fact is nowhere denied by the answer.

What authority, then, had Mrs. Harris to convey the interests of her minor children in this property? The interest an executor takes in the personal property of the testator, or the power of disposition he has over it, depends on the law of the country in which the testator lived at the time of his death.

Under our law, it is questionable whether there is any difference between an executor and an administrator, even in regard to the time at which the interest in the estate of the deceased vests; in other words, whether the title of the executor is not as much derived from the probate of the will and the grant of letters, as that of the administrator from his appointment. But whether this be so or not, it is very certain that the power of disposition of each over the property in his custody is precisely the same, except in those cases where our statutes permit an executor to make sales under the directions of the will, without the previous order of the Court.

Before the grant of letters testamentary, the executor can do no act incident to his office, for until his appointment he is not in office. If there is any delay in granting letters testamentary, or where there shall have been no application for letters, the Probate Court may appoint a special administrator to take charge of and collect the estate. (Act to regulate the settlement of the estates of deceased persons, sec. 88.) There could not be a stronger negative to the proposition, that the executor can act as such before obtaining letters testamentary, than this, which, in consequence of his failing or neglecting to apply for letters, puts the estate in charge of another agent.

Norris *v.* Harris.

The general provision in regard to sales is, that " No sale of any property of an estate shall be valid, unless made under order of the Probate Court." (Same Act, sec. 148.) Even perishable property cannot be sold without such an order, and the mode in which an order for the sale of any personal property shall be applied for, and the circumstances under which it may be granted, are determined by the statute, which declares also how it shall be made. (Secs. 149–153.) This is equally applicable to executors and administrators, and it presupposes the grant of letters. An executor is, therefore, not only without power to make a valid sale before he has qualified as such, but even afterward, unless the sale is authorized by the Court.

The only exception to this is to be found in section one hundred and seventy-eight, which provides that, when any " property is directed by the will to be sold, the executor or administrator, with the will annexed, may proceed to sell, without the order of the Probate Court, but he shall be bound, as an administrator, to give notice of the sale, and to return accounts thereof to the Court, and to proceed in making the sale, in all respects as if it were made under the order of the Court, unless there are special directions given in the will, in which case he shall be governed by such directions."

In the will of Charles L. Dell there are no directions for the sale of any property by his executrix ; and if the power given to her, for herself and as guardian of her children, to sell or exchange this property, could even be construed to be a direction in the meaning of the statute, no valid sale or exchange was made, because she had never taken out letters testamentary, and consequently never had any authority to sell as executrix.

She had just as little authority to sell as guardian, and for the same reason. She never qualified as such. (Act to provide for the appointment and prescribe the duties of guardians, sec. 10.) And further ; our statute does not recognize any power given by will to the guardian to sell the property of the ward without the order of the Probate Court, nor permit its exercise.

For these reasons, Mrs. Harris having no right or authority to sell and convey the interests of her children in this property, the bill of sale could only give to Norris a title to the undivided interest of Mrs. Harris, and that there was such a failure of title as justified the rescission of the contract by Norris.

In reply to appellants' brief, counsel cited : *Doggett* v. *Emerson et als.*

3 Story C. C. R. 700; *Daniel* v. *Mitchell et als.* 1 Id. 172; *Mason et als.* v. *Crosby et al.* 1 Woodb. & Minot C. C. R. 342; *Tuthill* v. *Babcock et al.* 2 Id. 298 ; *Smith* v. *Babcock et al.* Id. 246, as to the right to rescind the contract for an unreasonable deficiency in the number of cattle.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

In the year 1853, one Charles L. Dell, at that time a resident of Texas, died possessed of real and personal property situated in that State, and leaving a widow, Amanda, one of the present defendants, and two children, surviving him. By his last will, which was made in Texas, he gave all his estate, real and personal, to his wife and children, in equal interest one with the other, and invested his wife with the " sole and entire control " of the whole estate during her life, for the benefit of herself and children, free from the control and guidance of the Courts of law in that or any other State where she might reside at the time of his death, and with authority in her own name, and as guardian of the children, to sell or exchange the estate, or any part thereof, and to purchase with the proceeds such other property as she might deem best for her own interest and that of the children, without the interposition of any Court whatever, and appointed her executrix of his will and guardian of his children. The will was duly admitted to probate, and recorded in Harris county ; but whether any letters testamentary or of guardianship were ever issued to the widow, does not appear. The complaint alleges that none such were ever issued, and that she never qualified, either as executrix or guardian, and was never authorized by the judgment or order of any Court in Texas to act in either capacity. The answer does not specifically meet these allegations, so far as the issuance of letters is concerned ; but avers that all due and necessary proceedings were taken under the Constitution and laws of Texas to authorize her to act both as executrix and guardian, and to make valid sales of the property in that State or elsewhere.

In 1854, the widow of Dell intermarried with the defendant, Lewis B. Harris, and moved, with her husband, to Sacramento city, in this State, where she has ever since resided. In 1856, the plaintiff, Samuel Norris, entered into a contract with the defendants for an exchange of property, by which contract Norris conveyed to Mrs. Harris certain real estate situated in the county of Sacramento, and certain interests

17

in the bridge over the American river—the whole property being of the estimated value of $61,889, and paid to her in cash the sum of $9,120—and in consideration thereof, the defendants sold to him a number of slaves, identified and described by name and age; two hundred and fifty head of horses; seven thousand head of cattle, and other property, all being at the time in the State of Texas, and constituting part of the property which belonged to the estate of Dell, deceased.

Both instruments were executed simultaneously, and both recite a pecuniary consideration—that of Norris, a consideration of $70,000; that of Harris and wife, a consideration of $6,000 for the negroes, $9,000 for the horses, $56,000 for the cattle and other property—in all, $71,000. But the real consideration was, on the one side, the property conveyed and money paid by Norris; and on the other, the negroes, cattle and horses, and other property in Texas, transferred by the defendants. With his conveyance, Norris delivered to the defendants possession of the property in Sacramento, and they have ever since continued in possession of the same, with the exception of a small portion, which they have sold.

The bill of sale to Norris recites that the cattle were at the time running in the counties of Harris, Brazoria, Fort Bend and Galveston; and provides that upon the arrival of Norris, or his agent, in Texas, for the purpose of taking possession of the property, he might have the election of taking all the cattle belonging to the estate of Dell, without making a count; in which event, he was to notify the agents of the defendants in possession of the same of his intention to thus take them, and to pay an additional sum of $4,000; but that if he made a count of the cattle, and they exceeded seven thousand in number, he was to pay eight dollars per head for the excess; and if they fell short of that number, the defendants were to repay to him the same price per head for the deficiency. The bill of sale also provides that if the horses, on being counted, exceeded or fell short of the specified number—two hundred and fifty—the excess or deficiency should be paid for at the rate of thirty-six dollars per head. With the bill of sale, the defendants gave an order upon their agent in Texas to deliver possession of the property to Norris.

At the date of these respective instruments, three of the slaves had been sold, and it would appear that there was a deficiency in the designated number of horses and cattle. The evidence in relation to the

deficiency is not very precise or satisfactory.   No count had been made by any of the witnesses, and their statements are only conjectural and speculative in their character, and materially differ from each other. The evidence leads to the conclusion that there was a deficiency, but leaves its extent a matter of uncertainty.

Soon after the execution of the bill of sale, Norris proceeded to Texas to take possession of the property, and whilst there, became impressed, as it would seem, with the conviction that the instrument did not pass a good title to him, and that the property was different, both in quantity and character, from the representations made by the defendants.   He accordingly returned to California without taking possession, and soon after notified the defendants that he rescinded the contract, and tendered to them a retransfer of the property, and demanded a restitution of the property which he had conveyed to Mrs. Harris.   As the defendants insisted upon the validity of the contract, he instituted the present suit to obtain such rescission and restitution, and an account of the rents and profits of the property, conveyed by him, while in the hands of the defendants.

In the complaint, various charges are made of fraudulent representations by the defendants as to the quantity, quality and value of the property sold by them, none of which are supported by the evidence, and they are abandoned by the plaintiff's counsel.   The evidence, produced by the plaintiff himself, frees the defendants from the imputation cast upon their conduct, and fully vindicates the good faith of their acts.

The other grounds upon which the plaintiff rests his right to relief, are the alleged want of power in the defendants to convey the property, and the alleged deficiency in the number of slaves, horses and cattle designated in the instrument of sale.   Their determination will dispose of the merits of the plaintiff's claim to a rescission of the contract.   The validity of the counter claim asserted by the defendants, and the judgment rendered in their favor, will be subsequently considered.

The solution of the proposition involved in the first position of the plaintiff, must depend upon the construction given to the will of the testator, the necessity of letters of guardianship to invest Mrs. Harris with authority to act under the will, and the necessity of the direction of the Probate Court to give validity to the sale made.

The defendant, Mrs. Harris, styles herself in the bill of sale as

executrix, and designates the property as belonging to the estate of the deceased, but attaches her signature without any addition of the capacity in which she acts.    The will must be interpreted according to the law of Texas, where it was made, and where the property upon which it operated was situated.    To that law we must resort to determine the capacity of the testator, the extent of his power of disposition and the conditions upon which the power of alienation vested in the guardian was to be exercised.    (Jarman on Wills, 1 ; 2 Greenl. on Ev. sec. 671.)    In the present case there is no proof what the law of Texas is upon these subjects.    One of the counsel of the defendants insists that, in the absence of such proof, the rule is to presume the existence of the common law and to be governed by its principles. There is no doubt that the common law is the basis of the laws of those States which were originally colonies of England, or carved out of such colonies.    It was imported by the Colonists and established so far as it was applicable to their institutions and circumstances, and was claimed by the Congress of the United Colonies in 1774 as a branch of those " indubitable rights and liberties to which the respective colonies " were entitled.    (Kent's Com. 1 vol. 343.)    In all the States thus having a common origin, formed from colonies which constituted a part of the same empire, and which recognized the common law as the source of their jurisprudence, it must be presumed that such common law exists—it has been so held in repeated instances—and it rests upon parties who assert a different rule to show that matter by proof. (See *Inge* v. *Murphy*, 10 Ala. N. S. 895.)

A similar presumption must prevail as to the existence of the common law in those States which have been established in territory acquired since the Revolution, where such territory was not at the time of its acquisition occupied by an organized and civilized community ; where, in fact, the population of the new State upon the establishment of government was formed by emigration from the original States.    As in British Colonies, established in uncultivated regions by emigration from the parent country, the subjects are considered as carrying with them the common law, so far as it is applicable to their new situation, so when American citizens emigrate into territory which is unoccupied by civilized man, and commence the formation of a new government, they are equally considered as carrying with them so much of the same common law, in its modified and improved condition under the influence of modern civilization and republican principles, as is suited to their new condition and wants.

Norris *v.* Harris.

But no such presumption can apply to States in which a government already existed at the time of their accession to the country, as Florida, Louisiana and Texas.   They had already laws of their own, which remained in force until by the proper authority they were abrogated and new laws were promulgated.   With them there is no more presumption of the existence of the common law than of any other law. They were independent of the English law in their origin, and hence no presumption of the existence of the common law of England can be indulged.   In countries conquered and ceded to England, the common law has no authority without positive enactment, and for the same reason, that they were not part of the mother country, but distinct dominions.   (1 Blackstone, 107; Story on the Cons. 1 vol. 150.)

As Texas was an independent country at the time of its accession to the United States—having laws of its own, not being carved out of the ancient colonial provinces of England, like the original thirteen States, or formed by emigration into an uncultivated country from those States, but from a Mexican province by a successful revolution against the Republic of Mexico—no presumption can arise of the existence therein of the common law, which is the basis of the jurisprudence of the other States.

The question then recurs as to what is to be presumed as to the law of Texas, in the absence of any proof on the subject.   We can perceive only one way in which the question can be answered, and that is to presume the law of that State to be in accordance with our own.   We are called upon to determine the matter in controversy, and are not at liberty to follow our own arbitrary notions of justice.   We cannot take judicial notice of the laws of Texas, and we must, therefore, as a matter of necessity, look to our own laws as furnishing the only rule of decision upon which we can act; and to meet the requirement that the case is to be disposed of according to the laws of Texas, the presumption is indulged that the laws of the two States are in accordance with each other.   The authorities, with some exceptions, are to this effect. Thus, in *Smoot et al.* v. *Baldwin,* (1 Martin, N. S. 523) a question arose in the Supreme Court of Louisiana whether an instrument executed in Alabama was a mortage or a sale, and the Court said: "The law of Alabama has not been proved, and, conformably to the uniform decisions of this Court, we must decide this case by the provisions of our own." In *Allen* v. *Watson,* (2 Hill's S. C. Rep. 319) the plaintiffs brought suit in South Carolina to recover a sum of money won by the

defendants at a faro table in Georgia. It was insisted that before the plaintiffs could recover, they must show playing at faro to be illegal by the law of Georgia; but the Court said: "It is true, the legality or illegality of any transaction must depend on the law of the place where it transpires, but it is incumbent on those who would avail themselves of it to show what that law is. In this State (South Carolina) playing at faro is unlawful and punished by fine; and if we are obliged to determine that question, in utter ignorance of what the law of Georgia is, we must resolve it by our own rule, for the obvious reason that we have no other."

In *Monroe* v. *Douglass* (1 Selden, 452) the Court of Appeals of New York, in referring to the laws of Scotland, which were supposed to apply to the controversy involved, but which were neither asserted or proved to be different from those of that State, used this language: "It is a well settled rule, founded on reason and authority, that the *lex fori*, or, in other words, the laws of the country to whose Courts a party appeals for redress, furnish in all cases, *prima facie*, the rule of decision; and if either party wishes the benefit of a different rule or law, as, for instance, the *lex domicilii, lex loci contractus*, or *lex loci rei sitæ*, he must aver and prove it. The Courts of a country are presumed to be acquainted only with their own laws; those of other countries are to be averred and proved, like other facts of which Courts do not take judicial notice, and the mode of proving them, whether they be written or unwritten, has been long established." (See, also, as bearing more or less directly on this and kindred questions, *Arroyo* v. *Currell*, 1 Mill. La. 541 ; *Crozier* v. *Hodge*, 3 Id. 357 ; *Ex parte Lafonta*, 2 Rob. 495; *Smoot* v. *Russell*, 1 Martin, N. S. 522 ; *Campbell* v. *Miller*, 3 Id. 149 ; *Harris* v. *Alnutt*, 12 La. 465 ; *Greenwade* v. *Greenwade*, 3 Dana, 75 ; *Holmes* v. *Broughton*, 10 Wend. 75 ; *Abel* v. *Douglass*, 4 Denio, 305 ; *Thurston* v. *Percival*, 1 Pick. 415 ; *Crouch* v. *Hill*, 15 Ill. 265 ; *Titus* v. *Scantling*, 4 Blackf. 90 ; *Sheperd et al.* v. *Nabors*, 6 Ala. N. S. 637 ; *Ellis* v. *White*, 25 Id. 540.)

Assuming, then, for the reasons we have stated, that the laws of Texas are similar to the laws of this State on the same subjects, we proceed to consider the questions raised by the plaintiff as to the power of Mrs. Harris under the will. It is clear to us that it was the *intention* of the testator to invest his wife, not merely with the entire control of the estate during her life, but with the absolute power of disposition, subject to two qualifications—one, that the cattle should not be sold in

Norris *v.* Harris.

two years unless eight dollars per head could be obtained for them; and the other, that certain real estate should not be sold until the lapse of twenty years. Subject to these limitations, all power and authority are given to her to control, exchange or sell the property, without the guidance or interposition of the Courts of Law. Particular desire is manifested by the testator that her power should not be the subject of interference or embarrassment by legal proceedings. Her control of the estate is to be without the guidance of the Courts, and the sale or exchange of the estate is to be without their interposition. Language more expressive of his confidence in the ability of his wife to manage the estate, and of his desire to invest her with power of disposition, independent of all direction or dictation by any tribunal, could hardly be used. To require her to obtain that direction, or to be subject to that interference, would defeat the express provisions of the will. Mrs. Harris is legatee, executrix and guardian. In one or the other, or all these capacities, she had by the terms of the will the power to execute the bill of sale to Norris. The bill purports to transfer the property, and not any particular interest she may have possessed in her own right or as executrix or guardian. It is true, she describes herself in the instrument as executrix, but this is only a designation of her person, intended to identify her as the individual mentioned in the will. The designation does not operate as a limitation upon her power. If she possessed the power to dispose of the entire estate, she exercised that power when she executed the bill of sale. The transfer was valid, though the description was defective. The authority was vested in herself alone under the will, and could only be exercised by her in whatever way she was designated, or if no designation was affixed to her name. It is not the case of an agent or attorney exercising another's authority, and therefore proceeding only in his name. It was the exercise of her own authority, possessed in her own right.

The position taken by the plaintiff, that it was incompetent for the testator to provide for the sale by Mrs. Harris of the property of her children, without the direction of the Probate Court, is not tenable. The statute of this State in relation to guardians, and which we must presume to be in accordance with the laws of Texas, is only applicable, in our judgment, to cases where there is no direction by will as to the disposition of the estate left to the wards. If such estate were given, subject to a right of sale or exchange in the guardian, and thereby to acquire property, for their benefit, of a different character, it is difficult

to perceive in what respect the policy or letter of the law would be contravened. The object of the law, when there has been a testamentary appointment of guardian, is, as we conceive, to preserve the property for the benefit of the wards, so as to effectuate and not defeat the intentions of the testator. This view is strengthened by the consideration that there is no limitation by the law of this State upon the power of disposition by will. The statute is only operative where there is no testamentary power.

Nor is it necessary, under our statute, that any letters of guardianship should issue to authorize the guardian to act. The order of appointment, when made by the Probate Court, constitutes the authority of the guardian, and the will, in case of testamentary appointment, that of guardians in other cases. The will in the present case was admitted to probate; and, therefore, to its provisions Mrs. Harris must look as her source of power.

It follows, from the result to which we have arrived, that the bill of sale passed a good and sufficient title in the property to Norris; and this brings us to the consideration of the second ground upon which a rescission of the contract is sought by him—the alleged deficiency in the number of slaves, horses and cattle sold.

As we have already stated, three of the slaves designated in the instrument of transfer to Norris had been at the time sold, and it appears from the evidence that a deficiency existed in the number of horses and cattle, and hence, it is contended that the plaintiff was under no obligation to accept those which remained, on the ground that the contract was entire for the whole of the personal property. It is undoubtedly true that an entire contract is indivisible—that the whole must stand or fall together. But a contract, made at the same time, of different articles, at different prices, is not an entire contract, unless the taking of the whole is essential from the character of the property, or is made so by the agreement of the parties, or unless it is of such a nature that a failure to obtain a part of the articles would materially affect the objects of the contract, and thus have influenced the sale, had such failure been anticipated. In the present case, the contract includes three items—the slaves, the horses and the cattle. As to the slaves, the contract is clearly entire. A gross sum is fixed for the whole number, and no means for determining the price for each one is afforded, and hence the agreement is implied that the whole are to be taken or none. (Story on Contracts, sec. 23; Miner v. Bradley, 22 Pick. 459.)

Norris *v.* Harris.

As to the horses and cattle, a possible deficiency in their number was in the contemplation of the parties at the time, and hence provision for compensation per head was provided to meet such deficiency. The failure, then, to deliver the whole number of horses and cattle did not invalidate the contract as to them, but the sale of the three slaves, and the consequent inability to deliver the whole number, would have that operation as to the item of slaves, were it not for the subsequent and independent stipulation of the parties, by which provision was made for the sales which might take place before the news of the transfer to Norris could be received by the agent of the defendants. That stipulation obviates the objection on that ground. (*Mayfield* v. *Wadsky*, 3 Barn. & Cress. 361; S. C. 5 Dowl. & Ryl. 228; *Wood* v. *Benson*, 2 Cromp. & Jerv. 94.)

The views to which we have arrived as to the power of disposition of the defendant Mrs. Harris, under the will, and the alleged deficiency in the property designated in the instrument of sale, dispose of the claim of the plaintiff to a recission of the contract.

It only remains to consider the validity of the counter claim upon which the defendants recovered judgment. The determination of this point depends upon the construction of that clause in the bill of sale which provides that if Norris, on his arrival in Texas, should choose to take all the cattle without a count, he should notify the agent of the defendants in possession of his intention to do so, and in consideration thereof, pay the further sum of $4,000; but if a count was had, and the cattle exceeded or fell short of the estimated number of 7,000, the excess or deficiency should be paid for at the rate of eight dollars per head. No count was ever made, and no notification was ever given by Norris that he chose to take the cattle without a count; but on the trial, which was brought on in the absence of plaintiff's counsel, judgment was taken for $4,000, as though there had been such notification, after deducting from that sum the amount received upon the sale of the three negroes. In this respect the judgment is clearly erroneous. The sale is of all the horses and cattle belonging to the estate of Dell, estimated at a specified number, and the delivery to the purchaser was, of course, to be made by the defendants or their agents. The plaintiff was bound to receive them, and to pay for the excess over the estimated number, if, upon a count, any should be found to exist. This was the sole obligation resting upon him in the first instance, and the only one he agreed to assume, except upon condition that he should elect to take the cattle

without any count. This condition was a mere privilege, which he could claim or not, at his own mere volition, and for which, if claimed, he was to pay the sum of $4,000. He could thus have avoided one liability by assuming another; but as he did not think proper to change the extent or nature of his obligation, he cannot be charged as if the reverse were the case. The defendants could have made the count, and thus have fixed the liability of the plaintiff on his refusing or neglecting to take the cattle without such count. The defendants were not bound to wait beyond a reasonable time for his determination.

The doctrine of election, upon which the defendants attempt to sustain the counter claim, has no application to the contract in this case, That doctrine applies only to cases where the party, upon whom rests the performance, stands in the same position to both alternatives presented, and is bound to indicate his choice between them. Here there was no obligation resting upon Norris to choose between two things; he was not bound to indicate any choice, only in the event of desiring to take the cattle without a count. If he did not desire to do so, he was not required to give notice to that effect. The obligation to pay for the excess over the estimated number, if there were any, was absolute. without any expression of choice; but the obligation to pay the $4,000 was a conditional one, dependent solely upon the indication of his desire to dispense with the count.

In cases where the doctrine is applicable, the right of election, upon failure of the party upon whom the performance rests to indicate his choice, passes to the other side, as in this way only can the obligation become absolute and determinate. Thus, if a debtor, by a given day, is to pay money or furnish goods, it is evident that upon a failure to indicate which of the two he will do, the obligation would be indefinite and uncertain. But this is quite different from a contract to do a certain thing absolutely by a given day, with the privilege of discharging the obligation in some other way previously. In such case, if the privilege be not exercised, the obligation is not left in uncertainty, but is definite and absolute. So, in the present case, the failure or refusal of Norris to indicate any desire to take the cattle without a count, did not leave the character of his obligation in any respect indefinite and uncertain.

It follows, from the views we have expressed, that the judgment must be reversed and the bill dismissed, and the parties left to determine, by actions at law, their respective claims for any excess or defi-

ciency in the number of horses and cattle designated in the instrument of sale.    And it is so ordered.

BALDWIN, J. having been counsel for the respondent in the Court below, did not sit in the case.