## ESTATE OF P. N. MACKAY, DECEASED.

[No. 13,461; decided August 13, 1894.]

Marriage—White and Colored Persons.—A marriage between a white man and a colored woman is forbidden by the law of California, but if such a marriage is contracted in a state where it is valid, it will be recognized in this state.

Family Allowance—Validity of Marriage.—Where a colored woman claims to be the wife of a decedent by virtue of a marriage contracted in another state, she must, on her application for a family allowance, establish the marriage by a preponderance of proof, and no presumption will be indulged in her favor.

Family Allowance—Disputed Marriage.—Upon an application for a family allowance by a woman whose marriage to the decedent is disputed, her marriage must be established by the same quality of proof as in any other case.

Contract Marriage.—An Agreement to be "Husband and Wife" is distinguished from an agreement to live together as "man and wife." The latter agreement does not constitute a contract of marriage, and living together as "man and wife" does not constitute marriage.

Contract Marriage.—In Considering the Claim of a Contract Marriage, the circumstance that the alleged widow, a few days after her alleged husband's death, stated to the executors of his will that she was with child by him, and did not then or until sometime afterward assert her claim to widowhood, is to be taken as strongly negativing such claim.

Contract Marriage—Evidence.—The Acts of a Testator in making a bequest to a woman under a surname other than his own and describing her as his housekeeper, and in acknowledging a deed before an officer as an unmarried man, are evidence as to the truth of the facts so stated.

Void Marriage—Legitimacy of Issue.—Where the claim is made that a marriage was contracted in another state, which, if there contracted in fact, is valid under the laws of that state, and hence valid in this state, although such marriage would have been void if contracted in this state, the provision in section 1387 of the Civil Code that the issue of all marriages null in law are legitimate has no application.

Family Allowance—Void Marriage.—The court in this case finds: That the petitioner is not the widow and her child is not the child, either legitimate, adopted or illegitimate, of the decedent, and that the application for a family allowance should be denied.

Chas. J. Heggerty and Gaston Straus, for the petitioner.

Oliver P. Evans, for the executor.

COFFEY, J. This is an application, by petition, by and in behalf of Harriet Schenck Mackay for a family allowance under the statute, section 1466, Code Civil Procedure. The petition sets forth and alleges that P. N. Mackay died in San Francisco on April 21, 1893; that at the time of his death he and the petitioner were, and continuously from the 5th of September, 1880, had been, married as husband and wife, living, residing and cohabiting together as such, and mutually assuming and bearing each toward and with the other the relations, marital rights, duties and obligations of husband and wife; that said Mackay and petitioner, on about the fifth day of September, 1880, in the city and state of New York, mutually agreed and contracted to then and there be and become and thereafter, during their lives, continue married, under and by virtue of the laws of said state of New York, and to mutually sustain, bear and assume toward each other, and the world at large, marital rights, duties and obligations as husband and wife; and that then and there, under and by virtue of the laws of said state of New York, they were married in said state and became and were husband and wife and from that time on continuously down to the moment of his death said Mackay and petitioner resided, lived and cohabited together as husband and wife, and mutually assumed, bore and sustained toward each other and the world at large marital rights, duties and obligations as such husband and wife; that as such husband and wife they lived, resided and

cohabited together as Mr. and Mrs. P. N. Mackay in the said city and state of New York, from about the 5th of September, 1880, until about the 1st of March, 1884, whence, on about said last date, they removed to San Francisco, California, where they since lived and cohabited as such husband and wife and as Mr. and Mrs. P. N. Mackay from about the 25th of March, 1884, continuously down to the moment of his death on April 21, 1893, when he died in the arms of the petitioner in their family home, 1625 Polk street; that the laws of New York render and make incapable of contracting marriage in said state only those persons included within certain categories which did not comprehend either decedent or petitioner, and that they were both over the age of nineteen years, and by those laws they were both capacitated so to contract.

That on the twenty-second day of June, 1893, there was born to petitioner a child thereafter christened and named Ruth Margaret Mackay, which child was and is the issue and child of said marriage between decedent and petitioner; that an inventory and appraisement of the estate left by decedent shows its value as $355,000; that the indebtedness does not exceed $25,000; that the petitioner has no means of maintenance for herself and child, and that $250 per month is a reasonable sum to be allowed for their support pending settlement of estate. All of these allegations are traversed by the respondent executor, Duncan C. Mackay. It appears that the other executor, Robert G. Mackay, was not joined as a respondent or served with process, and a dismissal is asked for on the ground of nonjoinder, but that is not deemed of consequence by the court, as the application should be disposed of on its merits and not treated technically, if, indeed, there were anything in this point.

It is in proof that the applicant is a colored woman of the African race and that the decedent was a white man of the European race, and, consequently, they were incapable of contracting marriage, according to the laws of the state of California. If the relation of husband and wife subsisted between them, it must have been contracted elsewhere, in some country or state which recognized the validity of such a union. The allegation of the petition is that a marriage took

place in New York by contract on about the 5th of September, 1880. It seems that the laws of that state do not forbid such contractual conjugal relations, and therefore, if the testimony upon this point be true, the status thus created by contract entitles the applicant to the relief sought. It is incumbent upon her to establish her claim by a preponderance of proof. No presumption may be indulged in favor of her claim under the statutes of the state of California, which positively prohibit such marital miscegenation; but if it be shown by trustworthy testimony that such relation, however repugnant to our laws, had its origin in a manner and by a mode conformable to the statutes of another sovereign state, the courts of California are bound to respect it and to treat it as if it were not contrary to our code. If this court is not convinced that the applicant made a contract with the decedent in New York according to the substance of the allegation in her petition, then and there agreeing to be husband and wife, then her case fails entirely, and all the testimony introduced as to subsequent events becomes unimportant and immaterial. It can only be considered as tending to corroborate her claim of contract.

Is this claim of contract supported by the evidence? Do the allegations and testimony correspond? To what extent is the petition fortified by proof? In her petition the date of the contract is stated to be ''on about the 5th of September, 1880.'' It appears that neither she nor decedent was in New York in 1880. In her testimony she first stated that they went to Denver in the fall of 1879 and from there to New York the next fall; ''the marriage contract was written and signed in Denver, Colorado; he signed it first, then I signed it; he kept the paper; no copy was made; we were there a year or a year and a half.'' Upon further examination she said they did not go to New York until after President Garfield was assassinated; went there in the fall after the assassination, which was the fall of 1881; got married in New York in the same old way—no priest, lawyer, license, minister or judge, the same way by contract; the reason they got married again was that in Colorado and California colored and white persons cannot intermarry; in New York it is different; decedent kept the paper; she never touched his

papers. There is a discrepancy as to dates here between allegation and proof. In her testimony she says she was born in Fredericksburg, Virginia, "after the war," and that she is now (January, 1894) twenty-six or twenty-seven years old, but in her petition she swears that in September, 1880, she was over nineteen years of age—a disparity of at least six or seven years. In her petition she states that she and decedent lived, resided and cohabited together as Mr. and Mrs. P. N. Mackay in the city of New York from about September 5, 1880, until March 1, 1884; in her testimony she says she was in New York City from the fall of 1881 to March, 1884. There is no evidence to corroborate her statements, except the item of the tag from the drygoods house of Hugh O'Neill for a hat sold to a Mrs. Mackay for $3, and the deposition of the merchant showed that he recalled nothing of the transaction and knew nothing of the party. In fact, there is no evidence, apart from this tag, of a corroborative character from New York to support the pretensions of petitioner. Her claim is, as stated by her counsel, of a marriage by a civil contract, followed up by repute of the neighborhood in which the parties lived subsequent to the execution of the civil contract. There is no evidence from the neighborhood in New York where she claims to have so lived and cohabited with decedent. Her whole case of contract depends upon her statement. Her counsel argue that in an application for an allowance for support of family, strict proof of marriage is not requisite, but that if it be, such evidence has been adduced. The rule is that upon such an application the marriage must be established by the same quality of proof as in any other case.

The petitioner says she started from San Francisco in September, 1879, with P. N. Mackay, and that they traveled from here together in a Palace sleeping-car, occupying the same section at night, she the upper and he the lower berth, and took their meals on the train all the way from here to Denver. She is contradicted by Duncan C. Mackay, who traveled over the road in that month and year with his family. He says that meals were not served on the cars at that time. Passengers had to get out at eating-houses; that he inquired of a porter as to whether they could get meals on the train and was told they could not.

The evidence of Mr. Horsburgh, one of the managing passenger agents of that road, is that in 1879 no meals were served on board the train, and that the buffet service was not introduced until 1884.

If it is a fact that meals were served on those trains in 1879, it might have been proved by some of the numerous porters or conductors who were engaged there during that year. The fact that this has not been done shows that what Mr. D. C. Mackay and the railroad agent said is true. Is this a matter about which the petitioner would be mistaken? Would she be mistaken about having meals served on that train in 1879, going to Denver with Mr. Mackay to be married? She must have realized that she was in a delicate position traveling in a train with a white man, occupying the same section with him, and she must have been in a state of mind that would make it literally impossible to be mistaken whether they took their meals on a train or not. She starts at the very inception of this case with an important statement which is untrue. She is flatly contradicted by two witnesses, and no attempt to corroborate her evidence has been made.

Counsel for petitioner, in his opening argument, referred to the case of Pearson v. Pearson, reported in 51 Cal. 120, in which it was held that Laura Pearson, a mulatto woman, was the widow of Richard Pearson, a white man. That whole case hinged upon the fact that Richard Pearson, in his will, designated Laura as his wife and her children as his children, and devised his whole estate to them. The same case reported in 46 Cal. 609, establishes a doctrine favorable to the contention of the respondent in the case at bar.

Richard Pearson was married in Missouri by a solemnized marriage to Martha Powers. There was issue of that marriage Adelaide Pearson. Subsequently he was divorced from Martha, and brought this mulatto woman from Missouri to Utah, and there, according to her evidence, they contracted marriage by agreement in the following language:

"Q. What was the agreement? A. Well, the agreement was this: he told me that he would be my husband and I would be his wife.

"Mr. Van Clief—Q. Those are the very words he said? A. Those are the words he said, and that he would be kind

to me and I must be kind to him, and that I would live with him as long as he lived.''

This precise language is worthy of specific notation. Even if this petitioner had made the contract with Mr. Mackay that she claims to have made, it would not have constituted marriage under a decision of the supreme court of this state. An agreement to be husband and wife is distinguished from an agreement to live together as man and wife, as petitioner says the agreement was in this case. When Pearson came to California from Utah he brought this mulatto woman with him and settled on Grand Island in Colusa county, and there lived for something like ten years, raised a large family of children and dealt with the woman and children as his wife and children commonly in the community in which he lived. He was a wealthy man. The children grew up and were known to the neighbors by the name of Pearson—Theodore, Henry, Mary, William, Richard and Jefferson Pearson. Before he died in 1865 he executed his will, which was subsequently admitted to probate, and in which he designated Laura as his wife, and the children by name as his children, and devised and bequeathed his whole estate to them. The estate was distributed to the devisees and legatees named in the will. The probate of the will was effectual, but there was a defect in the notice in regard to distribution, and the consequence was that the distribution was not final or binding on the child of his first wife, Adelaide Pearson. She instituted suit to recover the whole estate, on the ground that she was pretermitted, and was entitled under the statute to the same interest in the estate as she would have been if there had been no will. She claimed that Laura was not the wife of Richard Pearson and that the children were not his. In other words, that Laura was his mistress and the children bastards. Upon that issue the case went to trial in Colusa county before Judge Keyser, and the only evidence introduced touching the subject of marriage was the will itself. Upon that evidence Judge Keyser decided that there was no marriage. In the supreme court it was contended that the will itself was not only evidence, but the very best kind of evidence of

the facts therein recited, and the supreme court sustained this contention and reversed the judgment of the lower court.

The comparison between that case and the case at bar may be borne in mind, where the petitioner is described in the will of P. N. Mackay as "Hattie Schenck, housekeeper."

Theodore, Mary, Henry, William, Richard and Jefferson Pearson were described in the will of Pearson as children of the testator.

Under the authority of Pearson v. Pearson, 46 Cal. 609, the declarations of P. N. Mackay in his will devising to "Hattie Schenck, housekeeper," a certain legacy, and in his deed, acknowledged before Notary King, that he was an unmarried man, are the very best evidence as to the truth of the facts so stated. According to the doctrine of Pearson v. Pearson, 46 Cal. 609, an entry in a family Bible, an inscription on a tombstone, a pedigree hung up in the family mansion, are all good evidence; declarations of parents in their lifetime are statements made without any temptation to exceed or fall short of the truth. So the statement of P. N. Mackay in his will, when he said "Hattie Schenck, housekeeper," was the natural effusion of the party who knew the truth. So the declaration before the commissioner that he was an unmarried man was the natural effusion of the party who knew the truth.

These are two of the most solemn declarations a man could make, one in his will and the other in an acknowledgment to a deed, where the law required him to state whether he was married or not; the latter, made in a most public and solemn manner before a commissioner of the state of Washington authorized to take such acknowledgments. How are these declarations to stand against the uncertain evidence of persons who are brought here to say that decedent said that he was married or that petitioner was his wife, or words to that effect? Are a man's solemn declarations in instruments of that kind of less avail than such transient testimony? The authorities cited in Pearson v. Pearson say that they are most important in such matters.

In Whitelock v. Baker Lord Eldon says: "Who must know the truth? And who speaks upon an occasion when his mind

stands in an even position, without any temptation to exceed or fall short of the truth?''

So far from the case of Pearson v. Pearson being an authority for petitioner, it is directly against her; and it establishes a principle contrary to her contention. It is true that in the Pearson case the woman who claimed to be the widow was a mulatto and within the statute prohibiting marriages between whites and blacks and mulattoes. The proposition in the Pearson case was whether the mulatto woman, Laura, had contracted a marriage with Pearson in Utah, a country in which it was competent for her to contract marriage with a white man. That contract was followed by cohabitation, open and notorious, for a long number of years, and the rearing of a family in this state. But the point upon which the whole case hinged was his declaration in his will that she was his wife and that the issue were his children. Suppose Richard Pearson in his will had said Laura Jones, housekeeper, or Laura Schenck, housekeeper, would the court have decided that there was a marriage? Certainly not. Suppose Richard Pearson, within a reasonable time before his death, had made a solemn declaration, such as Mackay made, that he was an unmarried man, could a marriage be maintained between Richard Pearson and Laura? Certainly not. That case is unlike the case at bar.

The evidence of the petitioner is that she took regular meals on the train. She describes how the table was situated and how it was attached to the side of the car on that train all the way from San Francisco to Denver. That evidence is shown to be false.

Next, according to her evidence at Denver, having arrived there in September, 1879—in her deposition: ''I got married in Denver; after we went to New York he gave me another writing.

''Q. Did you get married in Denver? A. We drew a contract in Denver, and when we went to New York he wrote another. We went from here (San Francisco) in 1879.''

She says the only persons she knew at Denver were Mrs. Ghost and her sister, also Mrs. Ghost. They were married

to brothers. She never knew any colored people in Denver. "Don't know any store we traded with in Denver."

Why didn't the petitioner produce the testimony of the Ghosts, if they knew her there, in any way that would be favorable to her case?

Petitioner states that when they reached Denver they went to a hotel, but she is unable to locate it by name or number. She says they took their meals there at the public table, together. This is not probable in the circumstances.

Coming to the next proposition—the contracts which she claims were made in Denver and New York, which she has not produced here, and which she intimated were taken away with the papers of P. N. Mackay by the executors. Some comments may be indulged about the improbability of her ever having had any such contracts and having allowed them to be lost, destroyed or carried away by the executors.

It will be borne in mind that P. N. Mackay died on Friday, the 21st of April, 1893. His body was removed from his house on the Sunday following; he was buried at Rockville, in Solano county, on Monday, the 24th. The executors never asked for his papers, his trunks, nor personal belongings until Tuesday, the 25th, so that petitioner had in her possession, under her entire control, the trunks, with the keys and the loose papers in the bureau drawer, from Friday, the day of his death, until Tuesday following—four days—with unlimited power to do as she pleased with them.

Robert G. Mackay testified that when they got the trunks they were unlocked and petitioner had the keys. George Mackay saw her handling the papers in the bureau drawer and tearing up some of them after his uncle's death. He told his mother about it. (See evidence of Mrs. Rosa Mackay.) Is it within the range of probability that she had, or that there existed among those papers, written contracts which declared that she was the wife of P. N. Mackay, and that she did not take and keep them? She says that she never had the control of these contracts. He kept them in his trunk; she left them in his possession; she trusted him implicitly. But in another place she says she showed the contract to a Mrs. Emily Monteur. This is a contradiction. She either

had the paper in her possession or she did not have it. She says she saw the contract at Polk street. She says she never had possession of it, and then at the same time says she showed it to Mrs. Montcur at the house of petitioner. What is the truth? What are the probabilities? One might infer from her story about these marriage contracts that they were made for Mr. Mackay's protection, not for hers. Was he afraid that she would deny the marriage relation? It is to be presumed that such contracts are made for the woman's protection. Here the order seems (from her evidence) to have been reversed, and the man procured the evidence of marriage and securely locked it in his trunk for his protection.

Petitioner admits that when Duncan C. and Robert G. Mackay, the executors, came to 1625 Polk street to get the effects of the deceased she had in her mind the question of the difficulty of establishing the fact that she was the widow of P. N. Mackay, but it never occurred to her to look for that contract; and it never occurred to her to tell the executors that she claimed to be the widow of P. N. Mackay. She says that upon that occasion she told them that she was with child by P. N. Mackay, and yet she never intimated, according to her own evidence, upon that occasion that she claimed to be his widow. If at that time she had the slightest consciousness of a just claim of being the widow of P. N. Mackay, can it be believed that she would not then and there have asserted it? When people do not speak when they ought to, they may not be heard when they do.

When Duncan C. Mackay and Robert G. Mackay went to that house on Polk street and asked this woman for the papers and trunks of the deceased, she said she was in the family way by him. She did not then claim to be his widow. That is a significant fact. If she had intended to assert such a claim then is when she would have spoken, and not later, after she had had time to reflect and conclude that possibly she might establish such a claim. A woman who has to take time for reflection before she can determine whether she has been married or not certainly never was married.

The letters written by P. N. Mackay to petitioner show clearly that no marital relation existed between them—not

even the sexual relation of man and mistress. These letters are, without exception, addressed on the envelope, "Mrs. Hattie Schenck," and without exception addressed inside to "Hattie," or "My dear Hattie," or "Dear Hattie," and are uniformly signed "Your friend." They contain expressions of friendship, wishes for her welfare and health, and particularly that he would like to eat some lamb and green peas prepared according to her style of cooking. He says she knew how to boil bacon very well. To a question put by the court, she answered that she cooked for Mr. Mackay and he paid her for it.

"Q. Paid you to cook it, did he? A. Yes, sir; he did."

But subsequently she corrected this so her answer would read: "A. No, sir; he did not."

There is a conspicuous absence in these letters of any reference to love, or suggestion that she is his wife. In none of them is there any term of endearment or word that would not properly be used by a man writing to a good servant. How should a man address a servant in a letter? Would he say Mrs. Hattie Schenck? "Dear Hattie" would be the most natural expression for a man to use to his servant, and his signature is dignified, natural and respectful—"Your friend." She testified: "I often received correspondence from my friends in the name of Mrs. Mackay." Where is that correspondence? The only approximation to such correspondence produced was a note purporting to have been written to her by Annie Taylor. She preserved the letters addressed "Mrs. Hattie Schenck." Why not the others addressed "Mrs. Mackay"? If they had an agreement, as she states, to call each other "ducky" and no other name, would not that word have appeared in some of these letters? Does he express a wish that she could be near to him with a "communicating room"? Is there any such expression in any of these letters? She testifies that "during a portion of the time, we were living at 1625 Polk street and in New York, we occupied the same bed and room."

According to petitioner's evidence, they left San Francisco engaged to be married when they arrived in Denver; she never had any sexual intercourse with Mr. Mackay, or with any

other man, until after this marriage contract was made in Denver, and yet they were three or four days in the hotel with communicating rooms. In one place she said they made the contract and he put the ring on in the hotel; in another statement it was about a week after they moved into a furnished house; in another place it was after Christmas. What were they doing in that house during this week, or until Christmas? Three or four days in the hotel, a week or month in a house with communicating rooms, before the contract was made. What purpose did they have in living in that way? Was she there as housekeeper, servant, or mistress? She was not his wife. It was certainly an equivocal position for a girl of her age, if her testimony as to her present age be true.

Petitioner has stated different times and years as to her arrival in New York; in one place she says she was in Denver in the fall of 1879; in New York the next fall. That would be in 1880. Says she went to New York the fall after Garfield was assassinated—that is, in 1881. The marriage she puts at some indefinite time after she arrived there. She does not know and cannot state. In one place she says she never read the contracts; in another, that he kept them in his trunk; again, she showed the contract to Emily Montcur at her—petitioner's—house. She saw it on Polk street. What were these contracts? What was the substance of them, or what did they state? What was the language? "He signed and then I signed after him." "Should live together as man and wife as long as we lived." "I did not read it; . . . . I don't remember the words." "He said we should live together as long as we lived, as man and wife." "New York marriage same as Denver." "We didn't have no judge or lawyer or license." "We didn't have no priest."

In Letters v. Cady, 10 Cal. 537, it was decided that such language does not constitute a contract to be husband and wife. "Living together as 'man and wife' is not marriage, nor is an agreement so to live a contract of marriage," is the language of the court. This case expresses the law of this state now in force, and is binding authority for this court. Under this authority a contract such as she claims, it is argued, would not constitute a marriage even if it had been made.

Letters v. Cady was decided before the law in this state was so changed as to make it necessary in addition to the contract that there should be an assumption of marital rights, duties or obligations.

How could she show her contract to Emily Montcur at the house of petitioner if she never had possession of it? How was that possible? Where did she get the contract to show? Then, again, she says she saw it on Polk street. She says that the papers were kept in a bureau drawer. She had access to Mr. Mackay's papers for four days after his death. If she had any such contract, or there had been one, as she claims, she certainly would have taken it and kept it. To say that she did not think of it is idle. She knew its importance, if she knew there was such a contract. There is another very significant fact that petitioner admits herself; she never received a letter from Mr. Mackay in which the words "dear wife" or "dear ducky" appeared. She says that when Duncan C. Mackay came to obtain his deceased brother's effects she then had in her mind that her claim to be the widow would be disputed. She then thought of that subject between the death of P. N. Mackay on Friday and the day that Duncan Mackay came to get those papers and trunks on Tuesday following, and yet, knowing that her claim to wifehood would be disputed, she never thought of looking for this contract (although it was there among those papers), or asserting her claim of widowhood.

Petitioner does not know whether Mackay was in Europe once or twice during the time she claims to have been his wife. This is certainly remarkable. It is such an event in the life of an ordinary wife (her husband being away in Europe) that she could not forget it. When decedent returned to the west, after being away something like thirty months—two and a half years—in place of coming here to San Francisco he went directly from New York to his mine in Washington and remained there a long time before coming down here—an improbable thing for a man to have done if he had a wife in San Francisco. She does not know where he was in 1886; could not tell if he was away one or two years; did not know in what year he went to Europe; did not know where he was

in 1887; from Europe he went to British Columbia, and was there six months; did not know whether he remained here a week or more when he first returned from Europe; he said he was in Europe two years and six months; petitioner said she would have starved whilst he was away if it had not been for her friends. She says she produced all the letters she ever received from him. None came from Europe. Considering that he was two and one-half years without writing and that her friends had to assist her, his conduct seems singular if he was her husband. She did not know how many times he was at home during the first five years they lived on Polk street, nor that he was there as much as two months during that whole period. She says he never went where there were black women. He was always first class. This contradicts all her evidence about his intimacy with negroes on Polk street.

As between Mr. Mitchell and petitioner, there is no mistake about what Mr. Mitchell said. Counsel for petitioner, in his oral argument, called the court's attention to what he styled the improbability of her having made any statement to Mr. Mitchell that she was not married, or did not claim to be the wife of Mr. Mackay, because he did not ask her any question that called for such an answer. That is exactly what he did ask her, what her claim was; and she claimed he was the father of the child she was going to have, but she did not claim that she was his widow. Her statement was called for by the question Mr. Mitchell asked. Counsel also commented on the improbability of any such conversation having occurred because Mr. Mitchell did not put anything on the subject in the proposed contract. He would not put anything in the contract on the subject because she made no such claim. If she had claimed at that time that she was the widow of P. N. Mackay, then, as a matter of course, in drawing up any paper for her to sign as a disclaimer about the paternity of the child, a disclaimer about being the widow would have been inserted. There would have been no propriety in putting such a disclaimer in a paper for her to sign when she had never before, and did not then, assert any such claim. During all the years she now claims to have been known as Mrs. Mackay her name appeared in the directory every year as Hattie Schenck.

Whenever she had an account it was in the name of Hattie Schenck. Instance: Lebenbaum & Co., where she had the name changed to Mrs. Mackay after his death. In the directory, after Mr. Mackay's death, she puts her name in as Mackay, but before that time it was Hattie Schenck. It is remarkable, if she was known as Mrs. Mackay as she claims, that she would give a misstatement of her name as "Schenck" to the directory canvassers in 1886, 1887, 1888, 1889, 1890, 1891, 1892 and 1893.

In 1886 her name appears: H. Schenck, lodgings, 1625 Polk.

In 1887 her name appears: Mrs. Harriet Schenck, 1625 Polk.

In 1888 her name appears: Mrs. Harriet Schenck, 1625 Polk.

In 1889 her name appears: H. Schenck, dressmaker, 1625 Polk.

In 1890 her name appears: Hattie Schenck, 1625 Polk.

In 1891 her name appears: H. Schenck, dressmaker, 1625 Polk.

In 1892 her name appears: Harriet Schenck, 1625 Polk.

In 1893 her name appears: Harriet Schenck, 1625 Polk.

That she would have so described herself in a public directory as Hattie Schenck, when all the time she was known as Mrs. Mackay and was calling herself by that name, is not credible. She says everybody on Polk street knew her as Mrs. Mackay. Mr. Horabin evidently never had heard of her as Mrs. Mackay. According to his evidence, he thought Mr. Mackay was Mr. Schenck. If this witness is to be believed, he entirely contradicted her evidence about her being known as Mackay on Polk street. Here was a man who had more dealings with her than any other person, and yet he had never heard of Mackay. Her account then was in the name of Schenck, and he thought the man who lived in the same house where she did (P. N. Mackay) was named Schenck.

These tradespeople who testify that small parcels were bought by her and sent "C. O. D." to Mrs. Mackay cannot find a scrap of paper or a book of any kind whatever to show any such thing. Wherever we find her accounts at Lebenbaum's, or at Mr. Curtaz's, the piano dealer, or anywhere else

where a series of payments were made by her and credit given to her, there we uniformly find her name "Hattie Schenck."

We now come to the evidence of Miss Maud Mackay, daughter of Duncan C. Mackay, executor. There is a conflict between her evidence and that of the two colored women (petitioner and Mrs. Morris) with regard to what happened when she was at the house (1625 Polk street) after her uncle's death. The claimant said that she opened the trunks, or one of the trunks, when Miss Maud Mackay was there. This statement Miss Maud Mackay denies positively. They say she was there and remained a long time the Sunday night after her uncle's body was removed. This she denies emphatically and says she was at home and did not go out that night. Her brothers and her mother corroborate her in that particular.

Counsel for petitioner adverts to the fact that Thomas Mackay did not hear the conversation between his sister and Mrs. Morris. Miss Maud Mackay asked her if she was the housekeeper, and she said, "No, I am the cook, and the other," pointing to Hattie, "is the housekeeper."

Two persons being present where sound occurs, one hears it and the other may not. The fact that Thomas Mackay did not hear that conversation, although he was present and might have heard it, in no way contradicts his sister's evidence. Such matters are discussed in works on evidence and in decided cases; especially in criminal and damage cases. For instance, two persons being present, one will hear a clock strike at a particular time; the other will say, "It did not strike at that time; I was in the room and knew it did not strike." There is no conflict in such evidence when properly considered; it only shows that one heard the sound, the other did not. Take the common illustration of accidents happening on steam railroads, near crossings, when somebody is run over and injured. The engineer testifies that he rang the bell, according to the regulations of the service, before they approached the crossing. One passenger will swear positively that he knows he did ring it, he heard him ring it; the other, equally positive, will say he did not; the fact being the latter did not hear it. They may be equally honest. One man's

mind is attracted to the sound and it makes an impression on him, the other's mind may be occupied in another direction and the sound not attract his attention. Miss Maud Mackay talked to Mrs. Morris and had her attention directed to her particularly. The attention of Thomas was called away, and he did not hear what his sister said. There is no real conflict between Maud and her brother Thomas. She is corroborated by her brothers Robert and George, and by her mother, as to the fact that she was at home that Sunday night, and did not go out. Had she done so her family certainly would have known the fact. It was no ordinary occasion; P. N. Mackay was in his coffin and the funeral was appointed for the next day. There is all this evidence of these witnesses, six on one side, including Mr. Mitchell, and petitioner alone on the other. There is a square conflict. The petitioner does not pretend to know when her husband was away from her, or when he returned, or during what intervals or how long he was absent.

Regarding the time they lived at Fern avenue, a remarkable discrepancy of opinion exists which argues and illustrates the uncertainty of the memory of witnesses about petitioner's affairs and transactions. The landlady, Mrs. Pouyal, fixes it at one year, the claimant at eight months, whereas the exact time was four months.

Petitioner testified that Mr. Mackay gave her a piano, and that it cost between four and five hundred dollars. The evidence showed that the piano was sold to Hattie Schenck on the installment plan and that the purchase price was $200, and that she, not Mackay, paid for it. The clerk who collected from her on Polk street knew her only as Hattie Schenck. That piano had been rented by her for some years at a monthly rental of $5, and the aggregate amount of rent before the sale was $200 or upwards. It was subsequently sold to her for $200.

Mrs. Amelia Morris testified that Hattie said, "This is Mr. Mackay, my husband," and that he made no comment, but bowed to her very nicely and asked her whether she would stay, and she told him she would. She says the contract was to pay her $3 per week. Then this Mrs. Morris says that when she and Hattie were both there Mr. Mackay would answer the

bell. It is improbable that he would be in the habit of attending the door bell when there were two colored women there, one of them, at least, confessedly a hired servant.

Petitioner testified herself, and called other witnesses to prove, that she was generally called and known as Mrs. Mackay. This was done, apparently, upon the theory that it was necessary for her to show that she was reputed to be the wife of P. N. Mackay; but when confronted with the fact that she had habitually caused her name to be published in the directory as Hattie Schenck, and used that name in her accounts at stores and other places, she undertakes to explain the circumstance by saying there was an agreement between her and Mr. Mackay at the time of the reputed marriage that she should go by the name of Mrs. Schenck. The court cannot accept such an explanation. She was not generally known as Mrs. Mackay, and there having been no marriage, nor contract of *marriage*, there was no agreement between her and Mr. Mackay that she should be known as and use the name of Mrs. Schenck.

Duncan C. Mackay and his wife both testified that their relations with P. N. Mackay were of the most intimate and friendly character, and that all their children were much attached to their uncle and he to them. Mrs. Mackay says that her husband and her boys went to see Pat almost every day when he and they were in the city. They took his mail to him regularly. She recollects when he returned from New York in 1884. He lived at their house from March 15th to September of that year. He was away part of that time, but when in the city he was at home every night—was never out later than 9 o'clock. His habit was to go out for a walk and smoke after dinner for half an hour and then return and remain home the rest of the evening. Never heard or knew anything about his visiting Stevenson street during that time. She recollects when he moved to Polk street, and heard that he took rooms over a florist's. That he lived there until about December 9, 1884, when he removed to 1625 Polk street, and remained until his death.

Duncan C. Mackay and his family lived within five blocks of 1625 Polk street during all the time P. N. Mackay resided

there. She (Mrs. Mackay) had heard he had a black house-keeper. Sometimes he spoke of his housekeeper, but he was a very quiet man, who seldom spoke of his domestic affairs. About a year before his death he took his meals at her house for two weeks; he said his housekeeper had the rheumatism and could not cook for him.

Neither Mrs. Mackay nor her daughter visited him at his apartments, because it was unnecessary, as he visited their house daily, when here, and when well enough. He was away most of the time between 1884 and until within a year and a half before his death.

Witness never heard an intimation that P. N. Mackay was married, nor of any such pretense by petitioner, until the present counsel was employed in this case. After P. N. Mackay's death witness was told that petitioner had made some claim that he was the father of her child. Witness never heard of the birth of a child in his apartments in 1885.

Petitioner testifies she did not know where he lived in June nor July, 1884, nor from March to August of that year, yet she testifies that he visited her every night. Would it not be remarkable that a husband and wife should live in the same city, see each other daily, and yet the wife not know where her husband lived? The evidence shows that petitioner lived on Stevenson street from March to September, 1884. Mrs. Mackay said her husband and son Robert went, after the death of P. N. Mackay, to obtain his effects. George told her he saw Hattie, after his uncle's death, take papers out of his drawer and tear them up. Witness says she was present when her brother in law's trunks were opened, and is positive there were no letters from Hattie to him among his papers.

Petitioner admits that all the money she ever received from P. N. Mackay whilst living at 1625 Polk street came through Lebenbaum & Co. The amount was uniformly $60 per month, as appears from the books of that firm and also from the checks and drafts of the deceased, and the evidence of Bibo, who says that "the monthly remittance of $60 used to come to be turned over to her." Out of this it appears she paid the

rent of the flat and other bills. Upon this point there is no dispute.

It appears from Mr. Pomeroy's evidence that when P. N. Mackay gave him directions for making his will, he said that he wished to leave a sum of money sufficient to produce an income of $60 per month during her life. He first suggested $10,000, but upon being told by Mr. Pomeroy it would be difficult to so invest $10,000 as to yield regularly $60 per month, he said "Very well, make it $15,000." He gave the direction, "Hattie Schenck, housekeeper," and also gave her address. The income provided was for her life only. "During her life, and upon her death to divide and distribute the trust estate to and among my brothers and sisters . . . . share and share alike." The rest of his will was in all respects the same as a will he had previously executed. The first will was destroyed after the second was executed. His plan was to provide for her after his death and during her life. About the same time he executed the bill of sale to her of the furniture in the flat at 1625 Polk street. Shortly prior to this time he deeded his property in Washington to the Skagit Cumberland Coal Company. The will, bill of sale of the furniture, and the deed (in acknowledging which he recites that he was a single man) were all parts of a general plan in settling his business affairs in a way he wished them to be administered after his death. It all proceeded upon the basis of his being an unmarried man, and that so far as his housekeeper, Hattie Schenck, was concerned, she should be provided for during her life.

The importance to be attached to these transactions is to show conclusively that he was an unmarried man when he died, and that Hattie Schenck, the petitioner here, was his servant and housekeeper, and nothing more. Who could know so well as P. N. Mackay himself? The evidence of Duncan C. Mackay is important. It contradicts the petitioner in many ways and shows conclusively that her evidence must necessarily be false in its most material aspects; that she was his brother's housekeeper and servant only; and that all her pretensions that she was his wife—or more to him than a servant—are false. It is unnecessary to repeat his evidence here.

He had been his brother's attorney in fact since 1862, and up to his death. Their relations were of the most intimate character. Duncan C. Mackay visited his brother P. N. Mackay very often at his house—or flat—No. 1625 Polk street. He always knew petitioner as his servant and housekeeper and nothing more, and his brother spoke to him of her as such. He was present when P. N. Mackay gave instructions for the preparation and execution of that document. The bill of sale of the furniture was inclosed in the same envelope with the will. It was a part of Mr. Mackay's plan for settling all his affairs preparatory for leaving the country permanently, or in the event of his death. The bill of sale was to be handed to her upon the happening of either event. He was away from San Francisco after he returned from New York as much as forty-two or forty-three months during a period of four years. During all that time he maintained his flat at 1625 Polk street. Ten days before P. N. Mackay's death he spoke of petitioner as his "faithful housekeeper." When the executors took possession of and examined deceased's trunks and papers they did not find—and witness never saw—a single word or line ever written by petitioner to P. N. Mackay, and he never put her name to paper in writing to witness. The deceased always called her his servant or housekeeper, and when witness visited the house 1625 Polk street, as he did very often, she conducted herself in all respects as a servant should, and he never suspected anything to the contrary.

Counsel for petitioner argue that the child exhibited in court is the "issue of the bodies of petitioner and deceased," and claims:

1. It is legitimate—born in lawful wedlock.

2. If not born in lawful wedlock, it is "the result of the relations between petitioner and deceased in California, a marriage prohibited by law, and section 1387, Civil Code, provides: 'The issue of all marriages null in law .... is legitimate.'"

3. That if the child is illegitimate, it was adopted by the deceased, under sections 230 and 29, Civil Code.

It is contended that if any of these three propositions be true, this application for a family allowance should be

granted. Of course, if a marriage and cohabitation had been proved, the child would be presumed to be legitimate. But there was no marriage, and, consequently, no such presumption arises. What is the evidence as to paternity? We have the petitioner's statement, but can she be believed? The other witnesses do not pretend that Mr. Mackay ever in terms acknowledged that he knew petitioner was enceinte by him.

The evidence about the baby clothes and that he knew she was going to have a child comes from suspicious sources, is unreliable and improbable, and, at most, circumstantial.

It is not disputed that Duncan C. Mackay and his sons, particularly Thomas and George, were in the habit of visiting the deceased very often during the latter part of his life, and they frequently saw the petitioner there in her capacity of servant. That none of them noticed that she was pregnant is practically admitted by her when she deemed it necessary to tell the executors that she was with child by the deceased. Where so many suspicious circumstances surround a case and where so much untrustworthy evidence has been introduced, as in this case, the court will look with suspicion upon all the evidence, and require strict and positive proof upon every point in issue.

If P. N. Mackay was aware that petitioner was about to bear a child to him, and he desired to recognize it, why did he not make provision for it? He had disposed of his whole estate by will and knew that he was old and infirm. He had provided for petitioner under the name of "Hattie Schenck, housekeeper."

The fact that he died without making provision for any prospective child of hers ought to outweigh all evidence introduced tending to prove that he ever admitted or believed that he was its father—and this even if he had known of her pregnancy. There is no written evidence that he ever admitted he was the husband of petitioner, or the father of any child born to her in his lifetime, or with which she was pregnant at the time of his death.

The law applicable to the alleged marriage in this case is simple: "All marriages of white persons with negroes or mulattoes are illegal and void": Civ. Code, sec. 60. The law of

Colorado is presumed to be the same as that of California: Norris v. Harris, 15 Cal. 252; Marsters v. Lash, 61 Cal. 624; Shumway v. Leakey, 67 Cal. 460, 8 Pac. 12.

Counsel for petitioner says: "The evidence shows substantially that two marriage contracts were made and entered into—the first, in the state of Colorado; the second, in the state of New York." Neither of these alleged contracts was ever made. The contract alleged to have been made in New York is the only one pleaded.

The law of Colorado being the same as that of California, the so-called Denver contract cuts no figure. Petitioner in her pleading relies solely upon the alleged New York contract.

"All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, are valid in this state": Civ. Code, sec. 63.

The question here is, Did she, Hattie Schenck, ever contract marriage with deceased in the state of New York? She swears in her petition that she and P. N. Mackay lived and cohabited together as Mr. and Mrs. P. N. Mackay in the city and state of New York from September 5, 1880, until March 1, 1884. In her evidence she says from the summer or fall of 1881 to March, 1884. Her evidence on this subject must be false, otherwise she certainly would have been able to have found some one who had known her there.

Her failure in this particular is not cured by any evidence as to the manner of her life in California.

In the case of Leach v. Pierce, 93 Cal. 614, 29 Pac. 235, and other cases of like import, there was no dispute as to the fact of marriage or legitimacy of children. That questions of such grave import can be disposed of ex parte, or that issues made by answer denying allegations of widowhood and legitimacy of children are not to be tried with reference to the pleadings like other issues of fact, has never been decided by our courts.

Sections 1464, 1465 and 1466, Code of Civil Procedure, manifestly proceed upon the theory of confessed widows and legitimate children. No marriage "null in law" is sought to be established here, and hence section 1387, Civil Code, has no application. The petitioner relies upon her alleged marriage in New York. There is no allegation or evidence of any

contract of marriage in California "followed by a solemniza-
tion or by a mutual assumption of marital rights, duties or
obligations." These parties were either married before they
arrived here in March, 1884, or they were never married.
They were never married, nor did they ever contract to be-
come presently husband and wife.

The claim that this child was adopted by deceased in his
lifetime, and before the child was born, cannot be maintained.
In what way did the deceased publicly acknowledge it as his
own? When and where was any such acknowledgment made?
In what way could he or did he treat an unborn child as if
it were legitimate?

There is no written evidence and no evidence of any wit-
ness that deceased ever in any way spoke of adopting this
child, or expressed a desire that it should inherit or receive
any part of his estate or derive any benefit from it. It does
appear that he had disposed of his whole estate by will with-
out making mention of any child to be born to him by peti-
tioner, or any other person. Is it to be believed that if he
had publicly acknowledged the paternity of this unborn in-
fant he would not have left some sign, some word, to his rela-
tives or friends indicating his purpose?

The evidence of petitioner's lady friends, that he was about
looking on and making comments about baby clothes, while
they were being made, is uncertain and unsatisfactory in its
character, and is contradicted by one of her most intimate
friends, Mrs. Murphy. She was the friend of many visits,
and, notwithstanding her apparent desire to testify in favor
of petitioner, she says that Mr. Mackay was not present when
the baby clothes were being made.

The application of petitioner should be denied because:

1. There is no widow nor child, legitimate or adopted, of
deceased to whom a family allowance can be made in this
proceeding; 2. The child of petitioner is not the issue of a
marriage null in law within the meaning of section 1387, Civil
Code, nor any other statute or law of the state of California;
3. The child in question is not the illegitimate child of P. N.
Mackay, deceased, and never was adopted or recognized by
him in any public way or at all as his child.

The rule as given by the Code of Civil Procedure, section 2061, is that the court, sitting as a jury, is not bound to decide in conformity with the declarations of any number of witnesses which do not produce conviction, against a less number or against a presumption or other evidence satisfying the mind; and the same section of the code also prescribes that in civil cases the affirmative of the issue must be proved, and when the evidence is contradictory, the decision must be made according to the preponderance of evidence.

Application denied.

---

The Principal Case was before the supreme court in 107 Cal. 303, 40 Pac. 558.

Contract or Common-law Marriages are considered at length in Estate of James, ante, p. 130, and extended note.

Marriages Between White and Colored Persons are considered, as to their validity, in the note to State v. Lowell, 79 Am. St. Rep. 382.